In re ADMIRAL'S WALK, INC., Debtor.

Jack L. GETMAN, Esq., As Chapter 11 Trustee for Admiral's Walk, Inc., Plaintiff,

v.

Robert GREEN, et al., Defendants.

Bankruptcy No. 90–11401 K.
Adv. No. 90–1182 K.

United States Bankruptcy Court,
W.D. New York.

Dec. 5, 1991.

Jack L. Getman, Buffalo, N.Y., Chapter 11 Trustee, for Admiral's Walk, Inc.

Alan J. Bozer, Albrecht, Maguire, Heffern & Gregg, P.C., Buffalo, N.Y., for defendants: Boxhorns, Inc., Lake Steel, Inc., Ken–Ton Fabricators, Inc., Community Steel Corp., Raymond E. Kelly, Inc., Paul Riefler, Inc., TRP Contracting, Inc., Clark Rigging & Rental Corp., Haney Erection Services, Inc., Allied Development, Inc., Barlow Sec. Systems, Inc., C.S. Behler, Inc., Keystone Bldg. Supply Co., Inc., Stilwell Bldg. Specialties, Inc. and Sherwin–Williams Co., Inc.

William H. Gardner, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., for Ferguson Elec. Const. Co., Inc.

Robert M. Spaulding, Paul K. Stecker, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for Marine Midland Bank.

Thomas J. Gaffney, Leader, Maislin & Gaffney, Buffalo, N.Y., for Balling Const., Inc., Balling Constr. Management, Inc.

Peter J. Martin, Bouvier, O'Connor, Buffalo, N.Y., for ALP Steel Corp.

James B. Denman, Denman and Dorn, Buffalo, N.Y., for Buffalo Contractors Equipment & Supplies, Inc.

Keith D. Martin, Cohen, Swados, Wright, Hanifin, Bradford & Brett, Buffalo, N.Y., for Jameson Roofing Co., Inc.

James W. Gresens, Saperston & Day, P.C., Buffalo, N.Y., for Davis–Ulmer Sprinkler Co., Inc., Frank L. Ciminelli Const. Co., Inc., Kipphut & Neuman Co., Inc., Joseph Davis, Inc., M. Fagliano Const. Co., Inc.

Paula Gutkin, Lacy, Katzen, Ryen & Mittleman, Rochester, N.Y., for General Elec. Co. and Spancrete Northeast, Inc.

Guy Van Baalen, Office of the U.S. Trustee, Buffalo, N.Y.

MICHAEL J. KAPLAN, Bankruptcy Judge.

### Procedural Posture

This matter comes before the Court in an unusual procedural posture. It arose in the September, 1990 filing of more than forty Adversary Proceedings by the Trustee of Admiral's Walk, Inc. (a Chapter 11 debtor whose Order for relief was entered on June 1, 1990). In each of those Adversary Proceedings the Trustee sought to determine the validity and extent of a different mechanic's lien as to property owned by the debtor. In several of those Adversary Proceedings a Third–Party Complaint was filed against Marine Midland Bank, seeking to subordinate the Bank's building loan mortgage to the mechanic's liens. Common issues being presented, all of those Adversary Proceedings were consolidated under a single docket number on November 6, 1990. Thereafter, more Third–Party Complaints were filed asserting subordination causes of action against Marine Midland Bank. By Order of May 21, 1991, Marine was deemed, on the consolidated docket, to be a co-defendant and the third-party causes of action were deemed "crossclaims." Before the Court now are motions and cross-motions regarding these cross-claims.

Before argument on October 31, 1991, the Court entered a stipulated Order under which "all papers and arguments" submitted by any party in connection with the various motions may be considered by the Court regardless, essentially, of whether they were filed in a previously discrete Adversary Proceeding prior to consolidation, or filed in the consolidated proceeding, and regardless of whether all parties who wish to rely upon a particular motion or memorandum of law have formally joined in it.

The Court fully approves of these commendable co-operative efforts of all parties to eliminate duplication of labor and attendant costs.

The Court now views this matter as a single Adversary Proceeding brought by the Trustee of Admiral's Walk, Inc. against all mechanic's lienors now before the Court and against Marine Midland Bank. The mechanic's lienors' claims against the Bank are now viewed as cross-claims, though initially raised as two specified causes of action in various Third–Party Complaints.

However, this Decision must continue to refer to the asserted causes as "Causes of Action." This is necessary for consistency with the Stipulated Exhibits and Memoranda of Law referenced herein, many of which were submitted during this matter's earlier procedural posture.

### Jurisdiction

The Court has jurisdiction over the motions and cross-motions at Bar by virtue of 28 U.S.C. §§ 157 and 1334, and the General Order of Reference of bankruptcy matters signed by the District Court on July 13, 1984. These are motions and cross-motions for summary judgment under the Federal Rules of Civil Procedure (Fed.R.Civ.P. 56), made applicable to the case at bar by Bankruptcy Rule 7056. They involve determination of the extent and priority of liens upon the debtor's property, and constitute "core" proceedings under 28 U.S.C. § 157.

## Introduction

■ Despite a 100–year history, what is now New York Lien Law § 22 ("section 22") has been the subject of remarkably few reported cases. Fewer still are the issues presented over the years to the courts under this important provision. Its text is set forth below. In combination with Lien Law § 2(13) it requires that if one is lending money to improve real estate and if the loan will be secured by a mortgage, the lender must file in the County Clerk's Office a Building Loan Contract ("BLC") and Borrower's Affidavit reflecting, at least, the consideration paid for the loan, the expenses in connection therewith, and the net sum available for the improvement. If this is not done, then the lender's mortgage may be subordinated to subsequently filed mechanic's liens. Moreover, any modification of a filed Building Loan Contract must be similarly filed, on pain of the same penalty. The goal is to inform suppliers of labor or materials of the extent to which they improve the property for the benefit of a mortgagee-lender.

The motion of the mechanic's lienors here constitutes a sweeping and broad-scale attack on a Building Loan Contract (and its execution) under New York Lien Law § 22. The arguments, subarguments and fallback arguments are complex and skillful. The cross-motions are more simply structured, but equally skillful.

Unless lien priority is restructured under Lien Law § 22 (or under 11 U.S.C. § 510 as discussed later), it appears that the lender's mortgage (over $6 million advanced before the filing of the Chapter 11 petition, under a $7.6 million mortgage), together with several million dollars of post-petition superpriority lending by the same lender to complete the project (11 U.S.C. § 364) and disappointing projected market value of the project, leave little (if any) value in the project to support the several millions of dollars ($2.5 million to $4 million) of filed mechanic's liens asserted here. (Precise valuations of the property and liens have yet to be undertaken.)

The Court has fully examined all arguments presented, and renders its decision herein.

New York Lien Law § 22 currently reads as follows in pertinent part:

A *building loan contract* either with or without the sale of land, *and any modification thereof, must be in writing and duly acknowledged, and must contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred in connection therewith, and the net sum available to the borrower for the improvement, and, on or before the date of recording the building loan mortgage made pursuant thereto, to be filed in the office of the clerk of the county in which any part of the land is situated, except that any subsequent modification of any such building loan contract so filed must be filed within ten days after the execution of any such modification.* No such building loan contract or any modification thereof shall be filed in the register's office of any county. *If not so filed the interest of each party to such contract in the real property affected thereby, is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter.* A modification of such contract shall not affect or impair the right or interest of a person, who, previous to the filing of such modification had furnished or contracted to furnish materials, or had performed or contracted to perform labor for the improvement of real property, but such right or interest shall be determined by the original contract.

Prior to its being amended in 1930 the statute was Lien Law § 21, not § 22 and read in pertinent part:

A contract for a building loan, either with or without the sale of land, and any modification thereof, must be in writing and duly acknowledged, and within ten days after its execution be filed in the office of the clerk of the county in which any part of the land is situated, and the

same shall not be filed in the register's office of any county. If not so filed the interest of each party to such contract in the real property affected thereby, is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter. A modification of such contract shall not affect or impair the right or interest of a person, who, previous to the filing of such modification had furnished or contracted to furnish materials, or had performed or contracted to perform labor for the improvement of real property, but such right or interest shall be determined by the original contract.

## I. Issues Presented by These Motions and Cross Motions for Summary Judgment

### A. Lien Law § 22 issues

1. Does Lien Law § 22, of itself, require the filing of all of the prior agreements of the borrower and lender that led to a filed Building Loan Contract?

2. When might references contained in a BLC to a prior agreement such as a Commitment Letter give rise to a duty under Lien Law § 22 to (a) file such prior agreement, or (b) file modifications with regard to subsequent conduct that is inconsistent with such prior agreement?

3. When might BLC provisions be interpreted in light of prior unfiled agreements in determining whether the BLC was or was not subsequently modified, for Lien Law § 22 purposes?

4. What provisions of a BLC that do not deal with the terms of the building loan itself are subject to the Lien Law § 22 modification requirement and subordination penalty?

5. Was a filed modification required in this case?

### B. 11 U.S.C. § 510 issues

Is summary judgment granting or dismissing an equitable subordination (11 U.S.C. § 510) cause of action by mechanic's lienors against the lender appropriate in this case?

### C. Issues Involving the Trustee's Adversary Proceedings to Value the Liens of Mechanic's Lienors

Is summary judgment in favor of any party appropriate in regard to the Trustee's efforts to value the liens of the mechanic's lienors?

## II. Holdings

### A. Lien Law § 22 issues

■ 1. Lien Law § 22 itself does not require the filing of prior agreements once a BLC is filed. For section 22 purposes the BLC becomes the true and complete agreement of the parties regardless of prior agreements.

2. (a) BLC references to a prior agreement might not of themselves give rise to a duty to file such agreement.

■ (b) Where, as here, there is no allegation that any person for whose benefit section 22 exists had knowledge of the contents of any prior agreements at any pertinent point in time, and no allegation that any such person ever read the BLC at any pertinent point in time, BLC references to such prior agreements do not give rise to a duty under section 22 to file modifications with regard to subsequent conduct that is inconsistent with a prior agreement.

■ 3. Subject to the same critical proviso as in 2(b) above (that no section 22 beneficiary knew about the prior agreements or their content, or read or relied upon the BLC itself), BLC provisions are not to be interpreted in light of prior unfiled agreements in determining whether the BLC was or was not subsequently modified.

■ 4. BLC provisions which on their face do not represent that a direct source of payment to section 22 beneficiaries has been created apart from the loan, are not subject to the section 22 modification requirement and subordination penalty (at least where, as here, there is no allegation that any section 22 beneficiary has read the BLC and was misled as to language regarding funding or capitalization apart from the loan proceeds).

5. The filing of a modification was not required in this case.

Summary judgment is granted to the lender-bank on the section 22 cause of action.

### B. 11 U.S.C. § 510 issues

There are genuine issues of disputed fact with regard to the equitable subordination claims. Summary judgment in favor of any party is denied. This case will proceed to trial on this cause of action.

### C. The Trustee's Valuation Actions

The motions and cross motions for summary judgment on the Trustee's complaints are denied. Resolution must await the outcome of trial upon the 11 U.S.C. § 510 cause of action.

### III. Facts

The following facts are not in dispute.

From early 1988 until the February, 1989 filing of the Building Loan Contract at issue Marine Midland Bank (MMB) and Admiral's Walk, Inc. (AWI) negotiated extensively regarding a $7.6 million loan from MMB for AWI's construction of a 10–story residential condominium complex to be built on the Buffalo waterfront. The estimated cost of the project was approximately $10.4 million.

Stipulated exhibits demonstrate that at some points in time during the months preceding the filing of the Building Loan Contract, a number of significant details were either presumed or negotiated. Among those were: there would be an award of a General Construction Contract to Balling Construction Co., and that contract would provide a fixed, guaranteed maximum price of construction; there would be performance and payment bonds; in addition to the mortgage, the loan would be secured by (among other things) either an assignment of deposit accounts in the amount of $1.2 million or an irrevocable letter of credit in that amount; and there would be an equity infusion of at least $2.8 million (I am rounding off the figures) over and above the $1.2 million (Stipulated Exhibits # 4–# 6.)

On February 17, 1989, a Building Loan Contract was executed and filed (Stipulated Exhibit # 3). On its face the Building Loan Contract addressed only some of the above details, and some are addressed in a manner seemingly inconsistent with the documented results of the prior negotiations. (Most important among the prior documents is a Commitment Letter dated December 15, 1988, since that letter is referred to in the Building Loan Contract, as discussed later.) No BLC modifications were ever filed.

Construction proceeded from that time until an Involuntary Petition under Chapter 11 was filed against AWI on May 10, 1990. In the meantime, upwards of forty mechanic's liens had been filed, totalling perhaps $3.5 million or more. A Trustee, Jack L. Getman, Esq., was appointed on May 31, 1990, and an Order for relief in Chapter 11 was entered on June 1, 1990.

The Trustee's expert estimated that the value of the project at the time of the Petition (at which time it was not complete) was $5,477,000. Others believe its value to have been higher. Postpetition superpriority lien borrowing from MMB was authorized to complete the complex.

Because fewer than half of the fifty units have been sold and sales efforts are not encouraging, the total cost and value of the project is not known. As of the date of the Chapter 11, MMB had advanced over $6 million (secured by its $7.6 million building loan mortgage) and its post petition liens apparently exceed $3 million. It is clear that the value of the property will not support the liens of both the lender on the one hand and any significant number of the mechanic's liens on the other, if any at all.

### IV. Discussion of Lien Law § 22 Issues

#### A. Purpose and Policy of section 22

Language from a 1906 decision of a New York Court of general jurisdiction regarding the purpose of section 22 (then section 21) is often cited even today [1] for the proposition that

---

**1.** See, for example, *In re Lynch III Properties,*   125 B.R. 857 (Bankr.E.D.N.Y.1991).

The statute is a safeguard against secret arrangements between lender and owner or contractor. It commands that *all* [emphasis in the original] agreements or modifications thereof be filed. The object is to acquaint the materialman with the exact amount of money to be advanced, the purposes to which it is to be applied and the times when or the stages of construction at which advances are to be made. In the terms of the agreement, is he to find a guide to his dealings with the owner or contractor. Therefore, the agreement filed should be a true agreement. Nothing should be left to conjecture. The materialman is not called upon to inquire beyond the actual terms of the filed instrument. The agreement is his source of information; the statute his protection. In the event of failure to comply with the statute, the interest in the real property of each party to the agreement is subjected to the lien and claim of the materialman thereafter filing his notice of lien.[2]

It is largely on the basis of such language that I am asked to hold that section 22 required that a certain Commitment Letter be filed. (Memo of Albrecht, Maguire, Heffern & Gregg, pp. 11, 12.) BLC § 1.8 defines "Commitment Letter" to be "Lender's agreement to make the loan dated December 16, 1988." That letter is mentioned elsewhere in the BLC, but no mention is made of the contents of the letter in the BLC.

Continued reliance on the language of the 1906 case, whether by courts in more recent cases[3] or by parties, is curious in four regards.

Firstly, that 1906 decision was reversed on the merits,[4] the highest Court of the State ruling that the BLC was not required to disclose the fact that $160,000 of the $370,000 loan proceeds were going to be used to satisfy a prior mortgage. Consequently, the highest court obviously did not agree that "all agreements ... be filed" or that "Nothing should be left to conjecture."

Secondly, section 2 of the Lien Law now appears to prescribe that so long as a BLC is filed, a prior agreement shall not be considered to be a BLC for Lien Law purposes.[5]

Thirdly, neither that 1906 case nor any significant case that has since focused upon the purposes of section 22 has ever done so outside the context of issues involving (1) the non-filing of a BLC, (2) the filing of a BLC that misrepresented how *loan proceeds* were to be applied and in fact were applied, or (3) *the requirement of a "payment bond."* These are discussed more fully later. Here it suffices to note that courts that have spoken of section 22 in broad, sweeping terms of "full disclosure" have exceeded the facts before their Bar.

Lastly, the Lien Law was materially amended in 1930. The last pre–1930–amendment statement of the highest court of the State regarding the purpose of the statute was in 1922 and was far less sweeping than the 1906 lower-court case cited. The State's High Court stated[6] that the object of the statute "is to acquaint prospective contractors with the fact that they furnish labor and materials subject to claims prior to theirs against the property ... and also to inform such contractors of the amounts to be advanced and the times of such advances."

2. *Pennsylvania Steel Company v. The Title Guarantee and Trust Company, et al.* (1906 Supreme Court, New York Special Term) 50 Misc. 51, 100 N.Y.S. 299.

3. For example, *Security Nat. Bank v. Village Mall at Hillcrest, Inc.*, 85 Misc.2d 771, 382 N.Y.S.2d 882 (1976), and *In re Lynch III Properties* cited at fn. 1 above.

4. *Pennsylvania Steel v. Title Guaranty*, 193 N.Y. 37, 85 N.E. 820 (1908).

5. In defining "Building Loan Contract," Lien Law § 2(13) states that " ... nothing herein contained shall be deemed to construe as a building loan contract a preliminary application for a building loan made by such owner and accepted by such lender if, pursuant to such application and acceptance, a building loan contract is thereafter entered into between the owner and the lender and filed as provided in [Lien Law § 22]."

6. *P.T. McDermott, Inc. v. Lawyers Mort. Co.*, 232 N.Y. 336, 133 N.E. 909. (1922).

The basis of the State High Court's 1908 decision in *Penn Steel* and its statement of section 22 purposes in *P.T. McDermott* are such, in light of the 1930 amendments, as to render them (and the Lower Court's *Penn Steel* statements) highly questionable authority for use as post–1930 statements of purpose. In fact, its 1908 holding in *Penn Steel* was overruled by those 1930 amendments which demanded that the BLC disclose the "net sum available" from the loan.

Consequently, it is only *post*–1930 decisions addressing the purpose of section 22 that are reliable authority for current purposes. Thus the New York Court of Appeals stated in 1979 that section 22 was amended in the late 1920's and early 1930's "to readily enable a contractor to learn exactly what sum the loan in fact made available to the owner of the real estate for the project." [7] This is the most recent statement of that Court on the subject, and the issue before it was whether section 22 subordination applied when the borrower's statement required by section 22 was materially false, and the bank knew it was false. (It answered that question in the affirmative.)

■ In light of this 1979 statement of the Court of Appeals, one might conclude that only *loan* provisions are within the ambit of section 22, even if other provisions are contained in the BLC. (For purposes of this Decision, the phrase "loan provisions" is used to connote the size, term, cost and application of the loan, rather than the conditions under which it will be extended. This is for reasons which will become apparent later in this Decision.) But there are more recent cases in which section 22 subordination is considered (whether granted or denied) with regard to a BLC

provision that has nothing to do with the net sum available from the loan. (These cases are discussed in footnote 15 herein.) They are persuasive of the notion that the purpose and policy of the statute is not just that stated by the New York Court of Appeals in the *Nanuet* case above, but also to permit mechanics lienors to invoke a section 22 subordination cause of action with regard to any BLC provision which on its face manifestly represents that a direct source of payment to them has been or will be established, apart from the loan proceeds. This is discussed more fully later in this decision.

■ At the least, the purpose of Lien Law section 22 is as stated by the New York Court of Appeals in the *Nanuet* case—"to readily enable a contractor to learn exactly what sum the loan in fact made available to owner of the real estate for the project." But *Nanuet* dealt with a materially false borrower's statement, and I believe that if the New York Court of Appeals now had before it a BLC with a "Payment Bond" requirement, it would hold the statutory purpose to be somewhat broader—broad enough to encompass within its modification and penalty provisions a BLC provision which on its face manifestly provides assurance to potential contractors of another direct source of payment apart from the loan advances.

## B. The Commitment Letter Was Not Required to be Filed, Nor did the BLC Incorporate its Terms

■ In light of the above analysis of the purpose and policy of section 22, I conclude that the Commitment Letter was not required to be filed. Section 2(13) of the Lien Law alone seems adequate to sus-

---

7. *Nanuet National Bank v. Eckerson,* 47 N.Y.2d 243, 417 N.Y.S.2d 901, 391 N.E.2d 983 (1979).

In their Memorandum of Law, the mechanic's lienors quote 7/10/30 statements of the chairman of the Joint Legislative Committee which spearheaded those amendments as follows: "He [a contractor or materialman] can go to the County Clerk's Office and find out the amount of the building loan mortgage. He can find out the amount of any existing ground mortgages that can be paid out of existing building loan

monies. He can know definitely the exact amount of the finance charges to be taken out of the building loan, so that he will know exactly the net amount that the owner will have available for the job. I assume, of course, the plans for the job are open for his inspection. He will have a fair opportunity of determining whether or not the amount available, or what relationship the amount available after payment of ground mortgages and finances charges, bears to the total cost of the building."

tain this proposition—if a BLC is filed, that becomes the true and complete agreement of the borrower and lender for section 22 purposes. The lender and borrower must abandon prior agreements to the extent that those are in conflict with the BLC.

And in fact the BLC at bar contained a provision directly to that effect. BLC § 8.14 states: "If any term of the Commitment Letter shall conflict with the terms of this Agreement, this Agreement shall control. As to any matter contained in the Commitment Letter, and as to which no mention is made in this Agreement, the Commitment Letter shall continue to be in effect and shall survive the execution of this Agreement, the Note, the Mortgage, and all other documents relating to the loan."

The mechanic's lienors argue that that portion of the above which causes the Commitment Letter to survive the BLC to the extent that the BLC is silent gives rise to a duty to file the Commitment Letter. In the alternative they argue that even without filing of the Commitment Letter, section 8.14 and other references in the BLC to the Letter suffice to incorporate within the BLC the unfiled terms of the Letter.

I might possibly agree with the mechanic's lienors at least with regard to the Commitment Letter's requirement of a Payment Bond if (1) mention were made anywhere on the face of the BLC that the Letter contained a provision for a direct source of payment of contracts other than the loan proceeds (such as if there were a reference to the Letter as being a document containing a "Payment Bond" requirement), or (2) there were any allegation that any section 22 beneficiary had knowledge that the Letter contained such a provision.[8]

But here Section 22 of itself did not require that the Commitment Letter be filed. Nor did post-BLC conduct inconsistent with the Commitment Letter, but con-

sistent with the BLC, require a filed modification. This holding and the text of section 8.14 of the BLC not only comport with Lien Law § 2(13), but rest on sound policy. Suppliers who had no knowledge of prior agreements and who have "record notice" (but no actual knowledge) of a filed BLC that nowhere suggests that a prior agreement contains anything for their benefit ought not to be able to invoke section 22, and the discovery processes of a lawsuit, in mere hopes that they will find (as happened here) in some prior agreement of the borrower and lender a provision to their possible benefit which they can point to and say, "I never knew about it; the BLC was silent about any benefit it might contain for me; but section 22 now requires subordination for my benefit."

In this case the mechanic's lienors must look to the terms of the BLC itself.

### C. The Content of the BLC is Not to be Construed in Light of the Commitment Letter

We turn now from what the BLC did not say to what it did say. With regard to a number of its provisions I am asked by the mechanic's lienors to construe the BLC language in light of the Commitment Letter. Specifically, I am asked to do the following:

A. Find that references to a General Contractor in the BLC[9] Carried with them the Commitment Letter's requirement that a General Contract in fact be awarded and that the contract include a guaranteed maximum cost of the improvement.

B. Find that provisions in the BLC dealing with a $1.2 million Letter of Credit (BLC §§ 1.15(e), 7.6) carried with them the Commitment Letter's requirements that such letter serve as added security for the MMB loan rather than as equity for general purposes of the borrower and that it be for the term of the loan.

---

**8.** As noted above, the BLC at Bar nowhere contains any mention of or reference to such a bond.

**9.** I note that there may be a factual dispute as to whether certain provisions of the Commitment

Letter had been effectively changed by the time the BLC was executed and filed. In light of my holdings today, such dispute is not of consequence with regard to the section 22 cause of action and to summary judgment thereon.

C. Find that a BLC provision permitting MMB to require all items required by the Commitment Letter before it would be obliged to make any advance (BLC § 3.1), together with the survival clause (BLC § 8.14) carried with it the Commitment Letter's requirement of a Payment Bond.

D. Find that a BLC requirement of a $2.8 million "equity infusion" to the project (BLC § 2.2) carried with it MMB's prior demand that a major portion of such infusion be "in cash, up front."

(The recitation above is somewhat oversimplified. The mechanic's lienors' arguments in these regards are layered and cumulative. Thus, for example, it is argued that there is linkage between the "General Contractor" issue and the "Payment Bond" issue. And as discussed later, there is in fact linkage between the "Letter of Credit Issue" and the "Equity Infusion" issue.)

█ The BLC provisions are not to be construed in light of the Commitment Letter for Lien Law § 22 purposes and this is true for many of the same reasons that I have concluded that the Letter was neither required to be filed nor was it incorporated into the BLC in this case, a case in which there is no allegation that any section 22 beneficiary had any knowledge of the prior agreement, or ever read the BLC at any pertinent point in time. Those reasons are amply stated above.

However, the mechanic's lienors' argument here is of slightly different ilk than their earlier arguments and requires resolution of one further issue, that of contract drafting and intent. It is argued that the language of the BLC must be construed strictly against the drafter, and that in light of New York Lien Law § 23 [10] it must be construed liberally in favor of section 22 beneficiaries.

In a somewhat related regard I note that in *HNC Realty v. Bay View Apartments*, 64 A.D.2d 417, 409 N.Y.S.2d 774 (1978), the Second Department applied an "intent of

the parties" rule in construing the language of a BLC. In fact the Court cited "Couch on Insurance" in determining that certain language in the BLC requiring a Payment Bond was "intended" to be "for the benefit of" suppliers and materialmen.

I do not mean to be facetious in stating that applying a standard of "intent to benefit" suppliers in interpreting language of a BLC would most typically yield nothing for such suppliers. BLCs are for the benefit of the parties to the BLC. It is Lien Law § 22's filing requirement that is for the benefit of suppliers, not the BLC itself. Consequently, I respectfully disagree with the Second Department's approach to interpretation of a BLC's language.

█ I agree with the mechanic's lienors that the language of the BLC must be construed strictly against the drafters. I do not believe that Lien Law § 23 requires a BLC to be construed liberally in favor of section 22 beneficiaries: I believe that it requires that the Lien Law itself be so construed.

█ Neither construing the BLC itself strictly against the drafter nor construing the statute liberally in favor of those whom section 22 exists to protect, requires construing the BLC itself in light of earlier agreements of which section 22 beneficiaries were totally unaware.

Section 22 requires disclosure of certain details regarding the relationship between a borrower and lender. To the extent that a BLC discloses more than is required, the lender is at risk as discussed below, and such disclosures will be construed strictly against the lender. But even a liberal construction of Lien Law § 22 in favor of its beneficiaries does not require what in a certain sense amounts to admission of parol evidence to address what are unambiguous terms of a BLC.

D. What Provisions of a BLC May Not be Modified Without filing of the Modification, under Lien Law § 22?

As discussed in Part IV–A of this Decision, prior to the 1930 amendments to sec-

---

**10.** "This article is to be construed liberally to secure the beneficial interests and purposes

thereof...."

tion 22 the highest court of the State held that the sanctions of the statute did not apply when a filed BLC disclosed a $370,000 "loan" for the improvement, but in fact $160,000 of that amount was used to satisfy a prior mortgage. This result was overruled by the 1930 amendments which required that the filing of the BLC include a sworn affidavit of the borrower reciting the consideration paid for the loan, the expenses incurred in connection therewith, and the "net sum available."

■ Thus it has since been correctly stated that any modifications dealing with those particular elements are, as a matter of law, to be considered "essential" and are subject to the statute's filing and penalty requirements.[11]

■ And the duty to file any modifications as to these elements exists regardless of whether any contractor read and relied upon the filed BLC.[12]

■ MMB invites the Court to rule that it is only modifications affecting the net sum available from the loan that are required to be filed, despite the fact that the BLC contains other types of provisions. That invitation is declined. For reasons discussed at footnote 15 and accompanying text, Lien Law § 22 requires that at least one other type of BLC provision be fully subject to section 22 modification and subordination provisions regardless of whether any contractor read the BLC, once the lender has chosen to include such provision in the filed BLC. That is any provision which manifestly establishes a direct source of payment for contractors apart from the loan. (Put another way, while it may be said that the required borrower's affidavit might pertain only to the net sum available from the loan, a BLC which requires that other sums or sources be made available for payment of contractors or suppliers, aside from the loan proceeds, requires that modifications of those provisions be filed.)

■ This does not mean that every BLC provision relating to overall funding or capitalization of a project is so subject, even if added funding is unconditionally required by the BLC. Unless the BLC dedicates such added sums or sources to payment of section 22 beneficiaries, then section 22 modification/penalty provisions will not be applied unless, at the least, a section 22 beneficiary was in fact misled by such provisions.[13]

E. No Provisions of the BLC on Their Face Represent that a Direct Source of Payment to Section 22 Beneficiaries has been Established Apart from the Loan

■ BLC provisions relating to the material aspects of the loan proceeds (net sum available, advances and retainage, etc.) are actionable under section 22 regardless of whether any beneficiary actually read the BLC.[14] This is true as well as to provisions, like those requiring a Payment Bond, which provide a direct source of payment to section 22 beneficiaries apart from the loan.[15]

---

11. *Security National Bank v. Village Mall,* 85 Misc.2d 771, 783, 382 N.Y.S.2d 882 (1976).

12. *HNC Realty Co. v. Golan Heights Developers, Inc.,* 79 Misc.2d 696, 360 N.Y.S.2d 954 (1974).

13. See discussion accompanying footnote 17 of this decision.

14. *HNC Realty Co. v. Golan Heights Developers, Inc.,* 79 Misc.2d 696, 360 N.Y.S.2d 954.

15. This is derived from the "Payment Bond" cases. Typically, a "Payment Bond" is an undertaking by a surety promising to pay unpaid materialmen. Although owners of property require them from general contractors to protect the owners (lenders, on the other hand, require "Performance Bonds" to assure completion of the project), materialmen are obviously benefitted thereby. Thus, in *HNC Realty v. Bay View Apartments,* 64 A.D.2d 417, 409 N.Y.S.2d 774 (1978), the Appellate Division, Second Department, subordinated the lender's mortgage where it was shown that although the BLC required a Payment Bond " ... satisfactory to lender ... covering all concrete, electrical and plumbing subcontractors" and others, the lender in fact accepted a bond which merely assured that the borrower would "faithfully account" for the proceeds of the loan, no provision being made in the bond for assertion of any rights by anyone other than the lender.

Similarly, in *Yankee Bank for Finance and Savings, FSB v. Task Associates,* 731 F.Supp. 64 (N.D.N.Y.1990), the District Court (referring to BLC language set forth in a Magistrate's Report

But these cases dealing with "Payment Bonds" have also persuasively established that when, in a BLC, it is only a lender's *"obligation to lend"* that is affected by a specified requirement, no rights are created in favor of section 22 beneficiaries. To be actionable under section 22, something which would benefit suppliers must be "required" by the BLC, and not merely left to the lender's option by the BLC.

In the case at Bar this principle resolves issues other than the Payment Bond issue. (The BLC here was silent regarding a Payment Bond; only the Commitment Letter required such bond and consideration of the Commitment Letter has been precluded.) Here the principle resolves the "Letter of Credit" issue and the "General Contractor" issue.

Article I of the BLC is entitled "DEFINITIONS" and BLC section 1.15 of that Article is entitled "Collateral Documents." Item "(e)" of section 1.15 describes a $1.2 million Letter of Credit.

Article VII of the BLC is entitled "REMEDIES UPON DEFAULT." At section 7.2 thereof it permits the lender (in the event of default) to take steps to enforce "the Collateral Documents," and at BLC section 7.6 it permits the lender to draw down "any Letters of Credit issued in connection with the loan...."

Most importantly, Article III of the BLC is entitled "CONDITIONS TO THE LOAN." Its preamble reads "Lender's obligation to make the Loan or any advance thereof shall be effective only upon fulfillment of the following conditions:". Section 3.3 then states: "Execution, delivery, and, when appropriate, recording or filing, of this Agreement, the Note the *Collateral Documents,* and all other documents evidencing or securing the Loan, and all other documents required by this Agreement, all in form and content satisfactory to Lender." (Emphasis added). This is the only provision of the BLC that actually requires production of a Letter of Credit.

As argued by MMB, the operative language of the BLC with regard to the Letter of Credit is that contained in the preamble of Article III. Production of such letter is a precondition to MMB's "obligation to make the Loan or any advance thereof." *In re Grossinger's Associates,* discussed in footnote 15 of this decision, is directly on point. It is correctly decided. Moreover, the District Court's decision in *Yankee Bank v. Task Assocs.* (also discussed in that footnote) implies that with suitable language making a Letter of Credit or Payment Bond discretionary with the lender, section 22 subordination would not be available.

Thus, it was within the discretion of MMB to require any type of Letter of Credit it desired, or none at all. Section 22 beneficiaries derived no rights from the BLC's provision for a Letter of Credit.

Similarly, the "General Contractor" issue is resolved by this reasoning. In the "DEFINITIONS" article of the BLC, section 1.11 states: *"General Contractor:*

not included in the Court's decision) stated that although the language "could be construed to make the provision of the bond discretionary with the lender, the more plausible reading of the entire agreement is that Yankee Bank was required to post the bond.... Having made this determination, it is clear that the [BLC] created specific rights in third parties, namely the defendant mechanics lienors ...," and the Court imposed section 22 subordination. It can be inferred from this language that the Court might have ruled to the contrary had the BLC more clearly made the Payment Bond a matter of the lender's discretion. (I have independently obtained the Magistrate's Report at issue, and it discloses that while the BLC was discretionary to the bank as to the first $610,000 of the loan, a payment bond was among items more defini-

tively required to be provided as a precondition of further advances.)

Finally, *In re Grossinger's Associates,* 115 B.R. 449 (Bankr.S.D.N.Y.1990), the Bankruptcy Court distinguishes *HNC Realty v. Bay View Apts.* on the grounds that the BLC in the *Grossinger's* case provided that the lender had "no obligation" to advance moneys unless a Payment Bond was provided. "There was nothing in the Building Loan Agreement that unconditionally obligated the debtor to obtain a payment bond," the Court stated, denying section 22 subordination.

These cases are significant not only for their holdings, but also as establishing the proposition that some BLC provisions that are not related to the loan funds are nonetheless actionable under section 22.

Balling Construction Company." The only provision of the BLC alleged to require that there in fact be a General Contractor on the project is section 3.1 which required that AWI provide "all items required ... under the terms of the Commitment Letter." But, again, this was required as a precondition to MMB's "obligation to make the Loan or any advance thereof." Even if section 3.1 were to have made express reference to the Commitment Letter's requirement of a General Construction Contract (and it did not), no rights would have been created in favor of section 22 beneficiaries.

■■■■ The last remaining issue for the immediate purposes of this Decision is that of the "Equity Infusion".

Section 2.2 of the BLC[16] absolutely required a $2.796 million equity infusion. (This was not set forth as a precondition to MMB's "obligation to lend.") Yet, the BLC did not specify how or when or in what form this infusion was to take place; rather BLC § 2.2 was satisfied if MMB was provided "with evidence reasonably acceptable to the Lender of an equity infusion to the Project of at least $2,796,455.00." According to the deposition of Mr. Chinnici, the MMB officer in charge of this loan, he saw such evidence and was satisfied.

I will return to this issue later with regard to whether the BLC loan provisions were subsequently modified without the requisite filing of a modification. But for present purposes it suffices to say that unlike a BLC provision for a Payment Bond, this provision did not establish a source of direct payment for section 22 beneficiaries. In short, even if section 2.2 had required $2.7 million in cash up front, it contains no manifest requirement that such funds would be applied to payment of mechanic's claims instead of, for example, to marketing or other "soft" costs. Total funding or capitalization of a project is certainly of interest to suppliers and may

heighten or lessen expectation of payment. It influences the supplier's perception of the funds available for the project. But if subsequent unfiled modification of such a provision is actionable under section 22 despite the absence of BLC language that sets such funds apart for contractors, then at the very least there should be a showing that a section 22 beneficiary was in fact misled. Such was the holding of the Appellate Division, Third Department, in a case in which it was argued that certain BLC's were "confusing and that it is impossible to determine the actual amount available for the cost of improvements." The Court dismissed this argument, stating that "There are, however, no specific allegations, affirmations or other evidence that [the lienor] was confused or misled by the documents."[17]

### F. The Loan Provisions of the BLC were Not Materially Modified After the BLC was Filed

The Court has herein ruled that the BLC did not contain any provision establishing a direct source of payment for section 22 beneficiaries apart from the loan, and that to the extent that the BLC may have been confusing or misleading as to other types of funding which may have been indirectly available to section 22 beneficiaries, it is significant that no such beneficiary was in fact confused or misled.

■■■■ Those are issues pertaining to third-party rights that a BLC might create. But those are not the only regards in which section 22 protects its beneficiaries. It also requires adherence to the agreement as between the borrower and lender. If there is not such adherence and any modification is not filed, then subordination will apply.

How strict is the adherence required by the statute? The lienors argue that any modification must be filed if it alters the

---

**16.** "As a condition to the advancement of the Loan, the Borrower will be required to provide Lender with evidence reasonably acceptable to Lender of an equity infusion to the Project of at least $2,796,455.00. The developer equity will be applied first to the total equity requirement as shown on the Use of Proceeds agreed to

between Lender and Borrower and then to closing costs and construction loan fees as shown on said Use of Proceeds." (The Use of Proceeds was not filed.)

**17.** *Amsterdam Savings Bank v. Terra Domus Corp.,* 97 A.D.2d 41, 470 N.Y.S.2d 448 (1983).

rights or liabilities between the parties "or" if it enlarges, restricts or impairs rights of third party beneficiaries. This is the rule stated in the case of *HNC Realty v. Bay View Apartments,* 64 A.D.2d 417, 409 N.Y.S.2d 774. Thus, it is argued by the lienors that anything that altered the rights or liabilities of MMB and AWI as set forth in the BLC required a filed modification, and that some such alterations occurred.

The lienors argue that even if the "Letter of Credit" provisions and "Equity Infusion" provisions of the BLC created no rights in their favor, the actual implementation of those provisions altered the relative rights and liabilities of MMB and AWI and required that a modification be filed.

They also argue that the BLC was violated as to the "Retainage" provisions and as to the "Consideration paid for the loan."

■ Even the *HNC Realty v. Bay View Apartments* case did not conclude that all modifications must be filed. It concluded that any "material" modification must be filed. While the Court in that case did state that a modification is "material" if it alters the rights and liabilities between the borrowers and lender "or" if it enlarges, restricts or impairs rights of third party beneficiaries, the "or" is misplaced. The *HNC* Court based its statement on two other cases which did not so hold. One was *Security National Bank v. Village Mall at Hillcrest, Inc.,* 85 Misc.2d 771, 382 N.Y.S.2d 882. In that case the BLC recited the project to be an apartment complex. The project later became a condominium complex, and the change (as to which no modification was filed) "was a major business decision going to the heart of the arrangement between" the lender and borrower *and depleted the lien-value of the improvement by 62%* by reason of the releases of the lender's mortgage to 285 unit owners. The case also addressed an underretainage which reduced by $800,000 the amount of money *which the lienors could reasonably have expected to be available at completion.* Thus it can be seen that not only did that case not hold that mere alteration of rights as between

borrower and lender is sufficient to warrant subordination, but that in fact third party rights were greatly impaired by the alterations at that Bar.

The *HNC* Court also rested its statement of the rule on *N.Y. Savings Bank v. Wendell Apts.,* 41 Misc.2d 527, 245 N.Y.S.2d 827 (1963). That case also did not recite such a rule. In that case the lender granted the borrower an extension of time to complete the project, but did not file a modification until well beyond the 10 days required by section 22. The Court noted that under the circumstances presented in the case, no harm was done and "no person's rights or liabilities" were changed.

Perhaps also being somewhat confused by the *HNC* Court's statement, the Court in *In re Lynch III Properties Corp.,* 125 B.R. 857 (Bankr.E.D.N.Y.1991), in reiterating the *HNC* Court's test of materiality, used no conjunction whatsoever (neither an "and" nor an "or") when stating that an alteration is "material" when it (a) alters rights between the parties, (b) enlarges or impairs rights of third party beneficiaries. That Court expressly stated that " ... courts are reluctant to inflict the subordination penalty of section 22 unless there has been a profound adverse impact upon the rights of the mechanic's lienors."

Whether or not one agrees with this last statement as to the reluctancy of courts, it is clear that alteration of rights as between the lender and borrower is not alone sufficient to warrant subordination—there must also be some element of impairment of rights of section 22 beneficiaries in order that a modification be so "material" or "essential" as to warrant its filing, on penalty of subordination.

Addressing now the lienors' specific arguments in these regards:

■ 1. Instead of requiring a $1.2 million letter of credit "for the term of the loan" (BLC § 1.15(e)) which MMB could draw down in the event of default (BLC § 7.6), MMB accepted a $1.2 million letter of credit that was to be drawn-down in eight installments between 2/17/89 and 12/30/89 (Stipulated Exhibit # 8). I hold

that because, as discussed earlier, the Letter of Credit was a condition only of MMB's "obligation to make the Loan or any advance thereof" (BLC § 3.3 and preamble); because draw-down was a remedy only for MMB (BLC § 7.6 and preamble); and because MMB reserved the right to apply the proceeds to draw-down to the cost of completion and/or the note, at MMB's option, MMB was free to accept any type of Letter of Credit (or even none at all) without having to file any modification.[18] The BLC created no third-party rights which could have been affected by MMB's decisions.

The BLC defines "retainage" as 10% of hard costs of then-completed construction (BLC § 1.12.) The mechanic's lienors initially argued that at times MMB overretained and at times it underretained. At oral argument, MMB explained that once the estimated cost of completion of the improvement was raised as permitted by BLC § 2.1, it is seen that MMB underretained at all times; it never overretained. This was not rebutted. Overretainage, it is said, "chokes off" funds for ongoing payment of suppliers. Underretainage frees up such funds, and becomes of adverse consequence to suppliers only if the building is complete. Upon completion the bank is obliged to make the final advance to the borrower. If too little has been retained and suppliers are unpaid, they are injured. I am persuaded by the case of *In re Lynch III*, 125 B.R. 857 (Bankr.E.D.N.Y.1991), that underretainage prior to the final advance is not a "material" modification.[19] Here the building was not complete at the time of AWI's Chapter 11 filing and the final advance under the BLC was never made. No third-party rights were impaired.

3. As to the "equity infusion" requirement of BLC § 2.2, the deposition testimony of Mr. Chinnici of MMB represents that MMB was satisfied with the evidence of the infusion. Toward the $2.8 million requirement he applied, among other things, the $1.2 million Line of Credit, AWI's projected profits from sale of units, and various items of expenses either paid or to be paid by AWI or others on its behalf. Stripping the mechanic's lienors' arguments of those aspects that rely on the Commitment Letter and other pre-BLC documents, it remains argued that MMB did not obey its duty under BLC § 2.2 to satisfy itself of a $2.8 million equity infusion. The only facts they have come forward with to overcome Mr. Chinnici's testimony that he determined the evidence of the infusion to be "reasonable" are contractor attestations as to what "equity" means to them. BLC § 2.2 left the matter of evidence of equity to MMB's discretion.

Even if it is presumed that MMB waived rights, no third-party rights were impaired and the mechanic's lienors' argument fails.

4. It appears that the Commitment Fee for the $7.6 million loan might have been $75,000 rather than the $95,000 stated in the borrower's affidavit filed with the BLC. It appears to the Court that the mechanic's lienors recognize that *de minimus non curat lex* and press this argument only to suggest a pattern by MMB of disregard of the provision of the BLC in the context of section 22 requirements. I do not find that pattern and find that the discrepancy is not a "material modification." (In fact, a lower commitment fee freed more cash for payment of suppliers of labor or materials.)

### G. Conclusion as to the Lien Law § 22 Cause of Action

I have considered the other arguments of counsel for the mechanic's lienors in section 22 regards and find them to be without merit. Summary judgment in favor of MMB is granted dismissing the section 22 cause of action asserted by the mechanic's lienors.

Nothing that I have said above is to be construed to affect the 11 U.S.C. § 510 (equitable subordination) cause of action in any regard. Conduct, intent, or agree-

---

**18.** See footnote 15 and accompanying text.

**19.** Cf. *Security National Bank,* 85 Misc.2d 771, 382 N.Y.S.2d 882 (1976).

ments prior or subsequent to the BLC, and analysis of the BLC provisions and compliance therewith, are "open" issues with regard to the section 510 cause of action to be addressed at trial, or upon suitable *in limine* motions.

*V. The Mechanic's Lienors' Motion for Summary Judgment on Their 11 U.S.C. § 510 (Equitable Subordination) Cause of Action Must Be Denied.*

In their Notice of Motion dated July 22, 1991, General Electric Company and Spancrete Northeast, Inc., by their counsel Lacy, Katzen, Ryen & Mittleman, Attorneys, seek summary judgment granting equitable subordination of MMB's mortgage under 11 U.S.C. § 510.

To the extent that it may be suggested therein that MMB has failed to properly answer the allegations of inequitable conduct raised in "The Boxhorn's Third–Party Complaint," I find that MMB's Answer to Stilwell Building Specialties, Inc.'s Third–Party Complaint (Stipulated Exhibit # 2) does in fact answer the pertinent allegations.[20]

The balance of that Notice of Motion and accompanying Memorandum of Law asserts that section 510 subordination is warranted by material misrepresentations regarding the equity infusion, the Letter of Credit, the payment bond and the requirement of a general contractor and construction contract. The argument suggests that the same matters attacked under Lien Law § 22 are themselves sufficient to establish the basis for equitable subordination under 11 U.S.C. § 510.

■ Even if that which is not a "material misrepresentation" for purposes of Lien Law § 22 might be a "material misrepresentation" for Bankruptcy Code § 510 purposes, MMB's conduct with regard to its exercise of the various provisions of the BLC are not of themselves sufficient to warrant equitable subordination as a mat-

ter of law. In the lienor's Memorandum of Law they cite *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977), as a leading case on the showing required for equitable subordination. It is argued that that case requires a showing of (1) inequitable conduct, (2) a resulting injury to creditors or unfair advantage to the claimant and (3) consistency with other provisions of the bankruptcy laws. But that case actually goes somewhat further. It states (563 F.2d 692, 702) that "the extent of the injury ... which resulted from any inequitable activities" is a critical part of the injury.

■ Therefore, assuming arguendo that MMB acted inequitably in its exercise of its prerogatives and rights under the BLC, and even if the lienors were damaged, it remains to be determined "the extent" to which the lienors were injured by the particular inequitable conduct at issue.

At oral argument the lienors noted (in opposition to MMB's motion for summary judgment on the equitable subordination issues) that the "reasonable inferences" that a hypothetical contractor might have drawn from the language of the BLC with regard to the choices that MMB might make and the chances that those might ultimately inure directly or indirectly to their benefit is a fact issue, not appropriate for resolution on motion for summary judgment.

The Court agrees. The inferences to be drawn from MMB's conduct in light of the language of numerous exhibits depend upon facts not yet resolved. Summary judgment in favor of the mechanic's lienors on the section 510 issues is denied.

MMB's Motion for Summary Judgment on the section 510 Issue Must Similarly be Denied.

■ Not only must those allegations of inequitable conduct that are specific to the BLC await resolution at trial, but the Third–Party Complaint of Stilwell (Stipu-

---

**20.** The procedural posture of this case is somewhat more complicated than appears from this decision, in light of consolidation of various Adversary Proceedings, recharacterizations of

certain Third–Party Complaints as "cross-claims," and other efforts to avoid needless paperwork and expenses to the various parties.

lated Exhibit # 1) at paragraphs 19–76, recites numerous instances of MMB conduct apart from the BLC which are alleged to constitute inequitable conduct and resulting injury. In its Memorandum of Law in Support of its Motion for Summary Judgment, MMB, by its counsel Phillips, Lytle, Hitchcock, Blaine & Huber, Attorneys, characterize only three of these numerous allegations as being "the central allegations" and they come forward with facts offered to overcome those allegations alone. Even as to those facts, the lienors' Answers to MMB's Interrogatories (Stipulated Exhibit # 14) raise genuine and material dispute. For example, the lienors' Answers to Interrogatories (at Q & A # 4.a. & # 4.b.) describe two pre–1990 "diversions of advances to persons not entitled to receive such funds" totalling $257,430 in which the bank allegedly "acquiesced," yet MMB's Memorandum asserts that "there is no claim of control of AWI's payments prior to January 12, 1990" and it addresses only advances on January 12, 1990 and thereafter. There are other examples of disputed fact which either alone or in combination render summary judgment inappropriate as to the equitable subordination claims.

#### Summary Judgment Must Be Denied as to The Trustee's Actions to Value the Mechanic's Liens

The mechanic's lienors' motion for summary judgment on the Trustee's complaints anticipated that the Court might grant summary judgment in their favor on both the Lien Law § 22 and 11 U.S.C. § 510 causes of action. In light of the Court's holdings today, the motion is denied, without prejudice.

The Trustee's cross-motion anticipated that the Court might grant summary judgment in favor of MMB on both the Lien Law § 22 and 11 U.S.C. § 510 causes of action. His motion too must be and is denied without prejudice.

#### Conclusion

No party has anticipatorily requested Federal Rule of Civil Procedure 54(b) certification of the Court's decision regarding the matters currently at Bar.

No final judgment is to enter at this time. This matter will proceed to trial on the 11 U.S.C. § 510 cause and on the Trustee's valuation actions only.

All arguments not addressed above have been considered and found to be without merit.

All of the above is so ORDERED.