OPINION OF THE COURT
 

 Fuchsberg, J.
 

 Resolving a dichotomy among departments of the Appellate Division on a matter of no small consequence to the construction and banking industries, we hold that under section 22 of the Lien Law a lender that knowingly files a building loan contract that materially misrepresents the net sum available to the borrower for the improvement suffers a subordination of its mortgage to subsequently arising mechanics’ liens.
 

 Appellant Nanuet National Bank is the holder of a building loan mortgage on three parcels of real estate developed for residential use by Eckerson Terrace, Inc., which requested an advance of $36,000 on each plot for a total of $108,000. Having agreed to make the loan, the bank saw to it that Eckerson followed the procedure dictated by section 22 for perfecting a lien on the property in favor of the lender. Complying with those requirements, the borrower executed, and the bank thereafter duly filed, a statement of the consideration for the loan and of the "net sum available to the said borrower for the improvement”.
 
 [1]
 
 The statement indicated that the consideration and the sum available were each $108,000. It also
 
 *246
 
 represented that all expenses connected with the loan were to be "paid by borrower”.
 

 It was in the face of record notice of the bank’s lien that respondents Token Carpentry, Inc., and Leon’s Plumbing & Heating, Inc., performed work and supplied materials for which they qualified as mechanics’ lienors on the property. The Token and Leon liens were duly filed. Perforce, subject to the challenge mounted by the contractors in this case, their liens, at least
 
 pro forma,
 
 were junior to that of the bank.
 

 The parties’ rights started on their collision course when the borrower defaulted in its obligations to the bank. There ensued this foreclosure action, in which the borrower as well as the mechanics’ lienors were named as defendants. The borrower did not contest the suit, but the contractors contended, in essence, that misstatements in the bank’s filing rendered its interest subordinate rather than superior to their own liens. Specifically, they point out that, since the bank expected to, and indeed did, deduct the expenses of procuring the loan from its gross amount, it must have realized that considerably less than $108,000 would in fact be "the net sum available * * * for the improvement”.
 
 [2]
 
 On the other hand, the bank’s position, stripped of unnecessary trimmings, is that the misstatements, if any there be, were not made by it, but by the borrower on its own behalf and that section 22 does not require that a lender guarantee the accuracy of statements for the filing of which it was only a conduit.
 

 These contentions having been tested on cross motions for summary judgment, Special Term, citing
 
 HNC Realty Co. v Golan Hgts. Developers
 
 (79 Misc 2d 696), held that the mortgage of a lender knowingly filing a materially false building loan statement is subordinated to subsequent mechanics’ liens. It then proceeded to deny the motions on the ground that whether the statement was materially false and whether the bank had knowledge thereof were disputed questions of fact. The Appellate Division, Second Department, in unanimously affirming, expressly rejected the contrary holding of the Third Department in
 
 Ulster Sav. Bank v Total Communities
 
 (55 AD2d 278). For the reasons which follow we uphold the determination before us now.
 

 At the outset, we acknowledge that section 22 provides no
 
 *247
 
 explicit answer to the dilemma which confronted the courts below. True, the statute tells us that information as to the consideration for the loan, the related expenses, and the net amount available to the borrower must be filed and that "[i]f not so filed the interest of each party to such contract in the real property affected thereby is subject to [subsequent mechanics’] lien[s]”. But it does not specify whether these consequences are to be visited on a lender that does file when it turns out that the information filed is inaccurate. In the face of legislative silence, we therefore must determine whether the words "so filed” refer not merely to the mechanics of the filing but also to the integrity of what is filed (see
 
 Becker v Huss Co.,
 
 43 NY2d 527, 541).
 

 The intent of the legislators, if ascertainable, is a particularly important guide to our construction. Turning for that purpose to the legislative history of section 22, we first note that the language at issue had its genesis in the economic malaise that prevailed at the end of the 1920’s and into the early 1930’s. The unusually heavy losses which "materialmen, supplymen and laborers” then suffered motivated the Legislature to take action which was thought likely to eradicate its root causes (see Report of the Joint Legislative Committee Investigating the Lien Law, Legislative Document No. 32 [1930]; see, also, Blanc, Mechanics’ Liens, par 46; cf.
 
 P. T. McDermott, Inc. v Lawyers Mtge. Co.,
 
 232 NY 336, 341-342 [discussing preamendment purpose of statute]). Section 22 was amended to readily enable a contractor to learn exactly what sum the loan in fact made available to the owner of the real estate for the project (see Hearings of the Joint Legislative Committee, p 1209 [1930]). And subdivision (3) of section 13 of the Lien Law was amended to strengthen the statutory provisions under which such funds were deemed to be held in trust.
 
 [3]
 

 
 *248
 
 Consistent with this overriding legislative objective, we believe the more reasonable interpretation of the statute is that which subjects the bank’s interest to the subordination penalty if it knowingly files a materially false statement. Obviously, since a false filing is a snare for the unwary contractor no matter who is responsible for the misleading information, a balanced analysis must focus on optimizing the likelihood that deception will not occur. The threat of a loss of priority is an effective deterrent to a lender’s indifference to the truthfulness of its client’s statement; in contrast, the borrower has no priority to lose. Without attempting to further define the limits of the bank’s obligation, there should be no doubt that it cannot with impunity file a statement it knows is inaccurate. In short, the bank’s role is a responsible one. It is neither perfunctory nor ministerial.
 

 The rule we announce is also consonant with a realistic awareness of the usual interplay among bank, borrower and materialman in the building loan context. The bank’s position is pivotal; without its financial support, contractors might be unwilling to risk their resources in a project run by a developer of perhaps questionable soundness. Frequently the bank is a working partner in the deal in that it co-ordinates its advances to the developer with the actual progress of the construction; at times, it may even bargain for an option to convert its mortgage into an equity interest. The mechanics’ lienor, on the other hand, is likely to find itself in a dependent stance; it must rely not only on the truth of the filed statement that shows how much of the bank’s capital is behind the job but also on the periodic advances which it promises. Our decision also pays heed to the practical consideration that, in many of the cases in which the question of priority arises, the materialman will have no other recourse because the owner is bankrupt (see, generally, Vitt & Bernstein, Convertible Mortgages: New Financing Tool, Real Estate Review, Spring, 1976, at p 33; Practicing Law Institute, Real Estate Development & Construction Financing Handbook [1968], § 5; Marks, Maloney & Paperno, Mortgages and Mortgage Foreclosure in New York [rev ed, 1975], §§ 141-143).
 
 [4]
 

 
 *249
 
 The vital and material parts which lenders tend to play in such transactions are hardly disproportionate to the obligations we have described. After all, the effort required for compliance is modest. Not only does a lender usually operate from a bargaining position strong enough to demand accurate information from the borrower, but the limited nature of the details required to be filed suggests they would in any event be within the lender’s ken.
 

 Consistent with our view, we, of course, cannot accept the theory advanced in the present case by the bank, that a contrary intent is to be divined from the proviso that lenders not be responsible for how borrowers later apply the funds loaned (see Lien Law, § 13, subd [3]). The duties we have articulated do not anticipate supervision of the construction project.
 

 Finally, we observe that, though no express provision in the statute ineluctably compels the construction we have adopted, it also comports with the Lien Law’s broader mandate that its provisions "be construed liberally to secure [their] beneficial interests and purposes” (Lien Law, § 23; see, also, Jensen, Mechanics’ Lien Law [4th ed], § 84). This adds further support to our conviction that, in harmony with the over-all motivation for the statutory enactments, the answer we have found is the very one the Legislature would have given had it addressed the precise point at issue in this case (Gray, Nature and Sources of Law, pp 172-173, cited with approval as to trusts and conveyances as well in 2 Scott, Trusts, § 164.1, and in 3 Restatement, Property, § 241, Comment
 
 c,
 
 respectively).
 

 For all these reasons, the question certified must be answered in the affirmative and the order of the Appellate Division affirmed.
 

 Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur with Judge Fuchsberg.
 

 Order affirmed, with costs. Question certified answered in the affirmative.
 

 [1]
 

 . The relevant portions of section 22 read: "A building loan contract either with or without the sale of land, and any modification thereof, must be in writing and duly acknowledged, and must contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred in connection therewith, and the net sum available to the borrower for the improvement, and, on or before the date of recording the building loan mortgage made pursuant thereto, to be filed in the office of the clerk of the county in which any part of the land is situated * * *. If not so filed the interest of each party to such contract in the real property affected thereby, is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter.”
 

 [2]
 

 . The contractors even suggest, though somewhat imprecisely, that part of the loan to the knowledge of the bank was to be applied in satisfaction of a prior lien.
 

 [3]
 

 . Relevant portions of this subdivision read: "(3) Every such building loan mortgage and every mortgage recorded subsequent to the commencement of the improvement and before the expiration of four months after the completion of the improvement shall contain a covenant by the mortgagor that he will receive the advances secured thereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement, and that he will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose, provided, however, that if the party executing the building loan contract is not the owner of the fee but is the party to whom such advances are to be made, a building loan contract executed and filed pursuant to section twenty-two of this chapter shall contain the said covenant by such party executing such building loan contract, in place of the covenant by the mortga
 
 *248
 
 gor in the building loan mortgage as hereinbefore provided. Nothing in this subdivision shall be considered as imposing upon the lender any obligation to see to the proper application of such advances by the owner”.
 

 [4]
 

 .
 
 Although the record does not reveal the borrower’s financial condition, as noted, it has not appeared to defend in this action.