**In re ELM RIDGE ASSOCIATES, Elm Ridge Associates II and Nob Hill Partners III, L.P., Debtors.**

**Ritz–Craft Corporation of PA, Inc., Plaintiff,**

**v.**

**National Education Benefit Fund and Nob Hill Partners III, LP, Defendants.**

**Bankruptcy Nos. 97–B–22243 (ASH) to 97–B–22245 (ASH). Adversary-No. 98–5149A.**

United States Bankruptcy Court, S.D. New York.

May 28, 1999.

Mazur Carp & Rubin, P.C. by Gary L. Rubin, New York City, for plaintiff.

Mark S. Tulis, Hawthorne, NY, for plaintiff.

Banks Gruen Shapiro & Gettinger, LLP by Mona D. Shapiro, Mount Kisco, NY, for defendant, NEBF.

### DECISION ON LIEN PRIORITY UNDER SECTION 22 OF THE NEW YORK LIEN LAW

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

In this adversary proceeding two creditors dispute the priority of their liens against the debtor's real property on cross-motions for summary judgment. The plaintiff, Ritz–Craft Corporation of PA, Inc. ("Ritz–Craft"), claims that the

prior construction loan mortgage lien of defendant National Electrical Benefit Fund ("NEBF")[1] is subordinated to the Ritz–Craft mechanics lien because of failure to comply with the requirements of Section 22 of the New York Lien Law. For the reasons set out below, Ritz–Craft is entitled to summary judgment on its claim.

### Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

### Background

Each of the three debtors in this jointly administered case owns a Section of a 416–unit rental apartment complex referred to as the Nob Hill Project in Elmsford, New York. Elm Ridge Associates owns Section I, Elm Ridge Associates II ("ERA II") owns Section II and Nob Hill Partners III ("NHP III") owns Section III. Each Section was sequentially developed, beginning with Section I and ending with Section III. All three Sections share infrastructure such as sewer systems, roads and public utilities. This lien priority dispute arises from the development of Section III.

All three debtors are owned and controlled by the same principals, who also owned and operated a separate company, Elm Ridge Management Inc., which managed the entire apartment complex from the beginning until replaced by an order of this Court. As asserted by NEBF, the Nob Hill Project was developed as a whole, with division into the three Sections for financing purposes.

By late 1994 the infrastructure (roads, grading, sewer and storm drains, utilities) was substantially complete for Sections II and III. NHP III came into existence as an entity with the filing of its certificate of limited partnership on December 9, 1994. Title to the Section III land and embedded infrastructure was conveyed to NHP III in two parcels on February 10 and 14, 1995.

NEBF provided the construction financing for NHP III's development of Section III (as it did for ERA II's development of Section II) through a $12.08 million loan evidenced by a "Building Loan Contract" and secured by a mortgage, both dated February 17 and filed on February 23, 1995. Attached to the Contract as an exhibit is a "Section 22 Lien Law Affidavit" dated February 14, 1995. The Section 22 Lien Law Affidavit itemizes fifteen projected expense items totaling $6,231,000, and recites $5,809,000 as the "net sum available to the borrower for the improvement."[2]

The Building Loan Contract was amended approximately ten months later, raising the amount of the loan by $1,920,000 from $12,080,000 to $14 million. A Section 22 Lien Law Affidavit for this incremental loan recited costs totaling $527,000 and $1,393,000 as the "net sum available to the borrower for improvement."

Thus, the aggregate "net sum available to the borrower for improvement" as represented under both Section 22 Lien Law Affidavits was $7,202,000 in respect of the aggregate construction loan of $14,000,000.

NEBF has filed a secured claim against NHP III in its Chapter 11 case for $13,-919,874.09 on account of unpaid principal, interest, fees and expenses in connection with the building loan for Section III.

Ritz–Craft manufactures and supplies prefabricated housing units. On May 24, 1995 Ritz–Craft entered into a $3,194,-057.40 contract with NHP III to manufacture and install 120 modular housing units

---

1. NEBF is incorrectly named in the caption as National Education Benefit Fund.

2. The sum of $6,231,000 and $5,809,000 is $12,040,000, which is $40,000 less than the $12.08 million construction loan. The discrepancy is not explained.

in Section III. (Ritz–Craft had also manufactured and erected 196 modular housing units in the construction of Section II under a separate contract with ERA II.) On April 30, 1996 Ritz–Craft filed a notice of mechanics lien against Section III in the amount of $384,251.52, consisting of $63,056.24 in unpaid labor charges and $321,195.28 in unpaid material charges. Ritz–Craft has filed a secured claim in the amount of $384,251.52 in the NHP III Chapter 11 case (as well as a substantial unsecured claim which is not relevant here).

### The Key Undisputed Facts

NEBF asserts in paragraph 52 of its statement of undisputed facts under Bankruptcy Rule 7056–1 that it disbursed $10,726,345 on account of "hard costs" to complete Section III. Ritz–Craft disputes paragraph 52 in only one respect.[3] It alleges that $4,504,333 of NEBF's initial advance to NHP III was paid to ERA II to reimburse it for preliminary site and infrastructure work, and that this amount cannot be included in the "net sum available to the borrower for the improvement" for purposes of compliance with Lien Law Section 22.

The written record establishes, and both sides now agree, that the amount of the reimbursement to ERA II was $4,616,191 (the "ERA II Reimbursement"). The facts respecting the ERA II Reimbursement are as follows.

Prior to 1995 ERA II caused the preliminary site and infrastructure work (the "Common Site Work") to be completed for the land on which both Section II and Section III are situated. Since the Common Site Work for Section III was physically adjacent and connected to that of Section II, some allocation of the site and infrastructure costs was necessary be-

tween Section II and Section III, since the two Sections were to have different owners with different creditors.[4] To accomplish this allocation the principals which controlled both ERA II and NHP III caused those entities to execute a document entitled "Repayment Plan" dated February 17, 1995.

The Repayment Plan recited that NHP III "is about to acquire certain real property ... for the development of ... Section III" and that ERA II had paid for the Common Site Work. The Repayment Plan provided that NHP III was required to "repay" to ERA II the "Site Work Advance" in the amount of $4,616,191 out of the first advance from NEBF to NHP III under the Section III Building Loan Contract in accordance with Section 4.6 of that Contract (*note:* there is no Section 4.6 in that Contract).

A letter from Elm Ridge Management, Inc. to NEBF enclosing a Request for Advance, both dated February 6, 1995, documented the ERA II Reimbursement.

### The Issue

At the argument held on this matter on March 24, 1999 I rejected arguments advanced by Ritz–Craft concerning the misidentification of the borrower and the line item of $5 million for "legal/environment/conting./misc/", ruling that these were not material defects in the first Section 22 Lien Law Affidavit.

The sole issue remaining for determination is whether the Section 22 Lien Law Affidavit correctly stated the "net sum available to the borrower for the improvement," and if not, the legal consequence of such failure. This issue depends solely on the question whether the ERA II Reimbursement of $4,616,191 can be deemed part of the net sum available to the borrower "for the improvement."

---

**3.** As a consequence, Ritz–Craft is deemed to have admitted paragraph 52 in all other respects under the express language of Rule 7056–1. *In re Luppino (Novartis Corporation v. Luppino),* 221 B.R. 693, 695–96 (Bankr. S.D.N.Y.1998).

**4.** Ritz–Craft disputes the allocation, but that dispute is not material in view of the Court's decision granting Ritz–Craft's motion.

For purposes of this decision, the Court assumes that $10,726,344 of the $14 million NEBF construction loan was used by the borrower for "hard costs" for Section III, as asserted by NEBF. The $10.7 million figure includes the $4,616,191 ERA II Reimbursement. If the ERA II Reimbursement cannot be deemed part of the cost of "the improvement" within the meaning of Section 22, the amount expended by NHP III on "the improvement" would be reduced to $6,110,153 ($10,726,344 less $4,616,191), which is $1,091,847 less than the $7,202,000 aggregate net sums available for the improvement as represented under both Section 22 Lien Law Affidavits.

### Discussion

The resolution of this dispute depends on the application of Section of the New York Lien Law. The statute provides:

> A building loan contract either with or without the sale of land, and any modification thereof, must be in writing and duly acknowledged, and *must contain a true statement under oath*, verified by the borrower, *showing* the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred in connection therewith, and *the net sum available to the borrower for the improvement*, and, on or before the date of recording the building loan mortgage made pursuant thereto, to be filed in the office of the clerk of the county in which any part of the land is situated.... *If not so filed the interest* of each party to such contract in the real property affected thereby, is *subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter.*

McKinney's New York Lien Law § 22 (1997) (emphasis supplied).

■ The statute's purpose is "to protect contractors and materialmen from deception by lenders, owners, builders, etc. by alerting contractors to the fact that they furnish labor and materials subject to claims prior to theirs against the property ... and also to inform [them] of the amounts to be advanced and the times of such advances." *In re 455 CPW Assocs.*, 192 B.R. 85, 88 (Bankr.S.D.N.Y.1996). It is fundamentally a disclosure statute and thus "subjects the [lender]'s interest to the subordination penalty if it knowingly files a materially false statement." *Nanuet National Bank v. Eckerson Terrace, Inc.*, 47 N.Y.2d 243, 248, 417 N.Y.S.2d 901, 904, 391 N.E.2d 983, 986 (1979). The obligation Section 22 places on construction lenders extends not only "to the mechanics of the filing but also to the integrity of what is filed." *Id.*, 47 N.Y.2d at 247, 417 N.Y.S.2d at 903, 391 N.E.2d at 985.

■ Turning to the key statutory language in Section 22 and in both Section 22 Lien Law Affidavits—the "net sum available to the borrower for the improvement"—it should be noted preliminarily that the term "improvement" is the subject of two definitions in the Lien Law, Section 2.4 "Improvement" and Section 2.5 "Cost of improvement." The latter is significant here because it addresses the question whether "cost of improvement" can include application of construction loan proceeds to reimburse the owner for costs expended *prior* to the first advance under the construction loan. The statutory answer is "yes," but with an important disclosure proviso. Section 2.5 provides, in relevant part:

> The application of the proceeds of any building loan mortgage or other mortgage to reimburse the owner for any payments made for any of the above mentioned items for said improvement prior to the date of the initial advance received under the building loan mortgage ... shall be deemed to be an expenditure within the "cost of improvement" as above defined; *provided, however, such payments are itemized in the building loan* contract [which must be publicly filed under Section 22]....

McKinney's New York Lien Law § 2.5 (1977) (emphasis added). A review of NEBF's Section III Building Loan Contract reveals that neither the ERA II Reimbursement nor any amounts for "common site work" were itemized or mentioned in the Contract or in the Section 22 Lien Law Affidavit. Nor was the Repayment Plan filed. The fact is that NEBF failed to disclose that the ERA II Reimbursement would not be available to NHP III to pay materialmen such as Ritz–Craft for construction of the "improvement."

There is other language in Section 2.5 that bears importantly on the issue here. The first sentence refers to "expenditures incurred *by the owner* in paying the claims of ..." (emphasis supplied). Similarly, the last sentence (quoted in block just above) refers to application of loan proceeds "to reimburse *the owner* for any payments made ..." (emphasis supplied). In this case, by contrast, the loan proceeds were used to reimburse ERA II, not NHP III (the owner of Section III), for expenditures incurred by ERA II, not NHP III.

Thus, the expenditures for site and infrastructure work comprehended in the ERA II Reimbursement do not fit the statutory definition in Section 2.5 of "Cost of improvement," and there was no compliance with the disclosure proviso of that Section.

These observations bring into sharp focus the crux of the problem with NEBF's legal position here—NHP III did not own the Section III real estate at the time the Common Site Work was done. NHP III purchased the Section III land in February 1995 *as it then existed,* complete with grading, roads, sewer and storm drainage, and utilities already in place. The $4,616,-191 that NHP III paid to ERA II, although labeled a "Reimbursement," was in economic substance part of the purchase price NHP III paid for the land—its proper description was "cost of acquisition," not "cost of improvement."

Viewed in this light, it is clear that the ERA II Reimbursement cannot be characterized as part of the "net sum available to the borrower for the improvement." The $4,616,191 was used by NHP III to acquire land already improved by the Common Site Work. The "improvement," as used in the statute, can only refer to NHP III's construction and development of the Section III apartment complex *after,* it acquired the land. The "net sum available" for that "improvement" cannot include money spent for land acquisition, under the statutory language in the relevant provisions of the Lien Law.

It is also undisputed that NEBF was fully aware of the existence of the ERA II Reimbursement at the time it filed the Building Loan Contract and of the fact that the first $4,616,191 of its Section III loan to NHP III was diverted to ERA II on account of money spent before NHP III even acquired the land. Thus, the material defect in the initial Section 22 Lien Law Affidavit was known to NEBF, as required by the New York Court of Appeals in the *Nanuet* decision.

NEBF's principal argument seems to be that the Nob Hill Project should be viewed as an interrelated whole with common infrastructure and easements and under the common control of one group of individuals, the only reason for the three Sections being financing. Counsel quotes from the debtors' Joint Disclosure Statement, which states: "The portion of the debt structure which differentiates the projects are its mortgages and mechanic's lien claims" [sic].

All of this may be so, but it has no bearing on the Lien Law analysis. The fact that each Section had its own mortgage and mechanics lien claims is precisely the point. The fact is that the Project was split and that each of the three Sections was owned by separate, juridical entities with separate capitalizations, debt structures and creditors including mechanics lienors. NEBF itself recognizes that the issue here is the priority of its Section III

mortgage lien versus Ritz–Craft's Section III mechanics lien. Sections I and II, their owners, mortgagees and lienors, have no bearing upon the validity or priority of these liens against Section III.

The Chapter 11 cases for these three debtors have not and cannot be substantively consolidated. The fact that a group of individuals collectively controlled separate organizations each with its own debt structure, land acquisition and lien obligations has no bearing upon the fact that the obligations of the different entities were different. The debtors and their controlling individuals, with the knowledge and participation of NEBF, chose to structure the Project using the form of a separate entity for each phase of development, each with its own funding structure, liabilities and lien obligations. NHP III's payment of the $4.6 million to ERA II on account of "Common Site Work" was undoubtedly an acquisition cost paid by a separate entity upon acquiring a separate parcel.

NEBF further argues that its actual disbursements for "hard costs" on the project totaled $10,726,344, citing authorities for the proposition that when the actual amounts expended on a construction project exceed the stated "net sum available" in the required affidavit, no claim for violation of Section 22 will lie. *See Federal Savings and Loan Ins. Corp. v. 52 Park Assocs.,* 710 F.Supp. 490 (S.D.N.Y.1989). As already shown, however, NEBF's argument does not accord with simple mathematics. The ERA II Reimbursement, $4,616,191, must be deducted from the $10,726,344 claimed as actually disbursed for Section III's development, leaving $6,110,153 "available" for the Section III "improvement." The amounts stated as available to lienors in both Section 22 Lien Law Affidavits total $7,202,000. Thus, actual disbursements on the project fell short of the stated amounts available by approximately $1.1 million. The shortfall is material by any standard and far exceeds the amount of Ritz–Craft's lien.

Finally, NEBF argues that because Ritz–Craft never read the Section 22 Lien Law Affidavits, it cannot show reliance and therefore has no claim. Case law is clear, however, that reliance in that sense is not an element of a lien subordination claim based on a failure to comply with Section 22. *In re Admiral's Walk, Inc.,* 134 B.R. 105, 118 (Bankr.W.D.N.Y. 1991); *HNC Realty v. Golan Heights Developers, Inc.,* 79 Misc.2d 696, 702, 360 N.Y.S.2d 954, 960 (Sup.Ct. Rockland Co.1974); *see also Nanuet,* 47 N.Y.2d at 244, 417 N.Y.S.2d at 902, 391 N.E.2d at 985 (setting out elements for a Section 22 claim with no requirement of reliance). The statute itself does not require that a materialman prove that it examined the Section 22 affidavit as a condition of subordination, and no case engrafts such a fraud-type reliance requirement to the statute. Under the case law in New York, Ritz–Craft is entitled to say, as it does, that it relied on the good faith compliance by the owner/borrower and the lender with their obligations under Section 22, without having actually gone to the Clerk's office to inspect the Section 22 affidavit.

Since NHP III and NEBF did not comply with Section 22, the Lien Law requires that NEBF's building loan mortgage lien be subordinated to Ritz–Craft's mechanics lien. Section 13(2) establishes the priority of a building loan mortgage over a mechanics lien, "provided the building loan contract is filed as required by section twenty-two of this chapter." Section 22 expressly provides that if the Section 22 Lien Law Affidavit (the "true statement under oath ... showing ... the net sum available to the borrower for the improvement") is "not so filed," the building loan mortgage lien "is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter." Thus, the lien of a properly filed building loan mortgage will have priority over the claims of mechanics lienors, *unless* the mortgagee has failed to comply with Section 22, which is precisely what occurred in this case. *Nanuet,* 47 N.Y.2d at 248, 417 N.Y.S.2d at 904, 391 N.E.2d at 986.

■ Taken together, Sections 13 and 22 and the New York Court of Appeals' decision in *Nanuet* effect a strict liability regime for knowing, material misstatements as to the amount of building loan proceeds available to materialmen. While construction lenders are not subject to subordination if scheduled amounts are not actually disbursed to materialmen, *Howard Savings Bank v. Lefcon Partnership*, 209 A.D.2d 473, 618 N.Y.S.2d 910 (2d Dep't 1994) (disclosure contemplated by Section 22 does not function to guarantee that project is adequately financed or economically viable), lenders are strictly liable for misstatements as to the existence of the facility in its stated amount.

As stated in *Nanuet:*

Consistent with this overriding legislative objective, we believe the more reasonable interpretation of the statute is that which subjects the bank's interest to the subordination penalty if it knowingly files a materially false statement. Obviously, since a false filing is a snare for the unwary contractor no matter who is responsible for the misleading information, a balanced analysis must focus on optimizing the likelihood that deception will not occur. The threat of a loss of priority is an effective deterrent to a lender's indifference to the truthfulness of its client's statement.... In short, the bank's role is a responsible one. It is neither perfunctory nor ministerial.

47 N.Y.2d at 248, 417 N.Y.S.2d at 903–04, 391 N.E.2d at 986.

Because I find that Ritz–Craft's lien is superior to NEBF's lien by operation of Lien Law Sections 13 and 22, it is unnecessary to address Ritz–Craft's equitable subordination argument.

Ritz–Craft is directed to settle an order consistent with this decision on five days' notice to all interested parties.