**In re ELM RIDGE ASSOCIATES, Elm Ridge Associates II and Nob Hill Partners III, L.P., Debtors.**

**Ritz–Craft Corporation of PA, Inc., Plaintiff–Respondent,**

v.

**National Electrical Benefit Fund, Defendant–Appellant,**

and

**Nob Hill Partners III, LP, Defendant.**

No. 99 Civ. 8973(CM).

United States District Court, S.D. New York.

Nov. 19, 1999.

Mona D. Shapiro, Banks Pickett Gruen & Shapiro, Mt. Kisco, NY, for National Electric Benefit Fund, appellant.

Gary L. Rubin, Mazur, Carp & Rubin, P.C., New York City, Mark S. Tulis, Oxman, Geiger, Natale & Tulis, P.C., Hawthorne, NY, for Ritz–Craft Corporation of PA, Inc., appellee.

## DECISION AND ORDER ON APPEAL

McMAHON, District Judge.

Defendant National Electrical Benefit Fund (NEBF)[1] appeals to this Court from an order and judgment of the United States Bankruptcy Court for the Southern District of New York (Hardin, B.J.), entered June 23, 1999, which granted plaintiff's motion for summary judgment subordinating NEBF's secured mortgage lien to a mechanics' lien subsequently filed by plaintiff-appellant Ritz–Craft Corporation of Pa., Inc. (Ritz–Craft). Judge Hardin subordinated NEBF's construction loan to Ritz–Craft's lien after finding that NEBF knowingly filed a materially false affidavit in violation of New York Lien Law § 22 (the Section 22 Affidavit). Because I conclude, as a matter of law, that NEBF did no such thing, I reverse the order of the Bankruptcy Court and grant summary judgment to NEBF dismissing Ritz–Craft's complaint in this adversary proceeding.[2]

## FINDINGS OF UNDISPUTED FACT

### The Parties

Debtors in this bankruptcy are three limited partnerships formed at various times to facilitate the development of Nob Hill Ridge, a 416 unit rental housing project located in Elmsford, New York. Nob Hill was developed in three tranches—Sections I, II and III. Each section is owned by a separate legal entity—one of the Debtors—and each entity is comprised of virtually the same individuals. Elm Ridge Associates (ERA) was the owner-developer of Section I; Elm Ridge Associates II (ERA–II) developed Section II; and Nob Hill Partners III, L.P. (NHP–III) developed Section III.

Adversary Proceeding Plaintiff Ritz–Craft was a contractor on the Nob Hill Ridge project, supplying pre-fabricated housing for Sections II and III. On Section III, the tranche at issue on this appeal, Ritz–Craft's contract price was $3,194,057.00, of which Ritz–Craft has been paid all but $384,251.52. On April 30, 1996, Ritz–Craft filed a mechanics' lien in the amount of the unpaid balance.

Adversary Proceeding Defendant NEBF is the jointly managed pension fund of the International Brotherhood of Electrical Workers and the National Electrical Contractors Association. NEBF financed the entire Nob Hill project, lending about $14 million to NHP–III, virtually all of which (including interest) remains unpaid. NEBF has filed a claim in the bankruptcy for $13,919,874 in principal, plus interest, fees and expenses owed to it by NHP–III.

### The Section 22 Affidavit

Section III consists of 120 rental units. NHP–III purchased the major portion of the Section III real estate from Cross Westchester Development Corporation, as Nominee ("Cross Westchester"), and the balance from Herb and Lucette Besson. NHP–III entered into a written contract with Cross–Westchester on December 8, 1994, and fee title passed to NHP–III on or about February 14, 1995.

All three sections of the Nob Hill project share common infrastructure. At some time during 1994, the developers of Sections II and III concluded that certain Common Site Work (consisting of basic earthwork, clearing and grubbing, rock excavation, rough grading, retaining wall work, street widening, sidewalks and curbs, water supply system, water main connection to the municipal water supply, fire hydrants and valves, storm water

1. NEBF was erroneously sued as National Education Benefit Fund. Apparently, no effort was made to amend the caption in the Bankruptcy Court. This Court *sua sponte* deems the caption amended to reflect the defendant's correct name.

2. The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard; the bankruptcy court's conclusions of law are reviewed de novo. *See Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.),* 896 F.2d 1384, 1388 (2d Cir.1990).

management systems, sanitary sewer system installation, and public utilities installation) should be completed on the Section III site, even though NHP–III had not yet taken title to the site. Since the Section III construction loan was not yet in place, the developers decided that ERA–II would fund the Common Site Work on NHP–III's behalf, and that ERA–II would be reimbursed when the Section III construction loan closed. ERA–II and NHP–III entered into a separate written agreement (the Repayment Plan) with respect to reimbursement for this infrastructure work. There is no dispute that the Common Site Work was essential for the Section III improvement.

On or about February 17, 1995—three days after NHP–III took title to the site—NHP–III and NEBF entered into a written and acknowledged Building Loan Contract, pursuant to which, *inter alia*, NEBF agreed to extend a construction loan to NHP–III in an aggregate amount not to exceed $12,080,000, for use in the construction of Nob Hill Section III. The loan was fully secured by a Mortgage and Security Agreement. In accordance with the requirements of the New York Lien Law § 13,[3] paragraph 12 of the Building Loan Contract states that NHP–III will hold the advances it receives or has a right to receive as a trust fund "for the purpose of acquiring the Real Estate and paying the costs of construction of the improvements." It further provides that the funds will be applied to those purposes ahead of all other purposes. There is no discussion of the promised reimbursement to ERA–II for the Common Site Work.

The loan closed on February 23, 1995. Immediately after the closing, NEBF perfected its security interest in Section III by filing the Building Loan Contract and recording the Mortgage in the Westchester County Clerk's Office.

Section 22 of New York's Lien Law requires that a certified statement setting forth the amount of the construction loan that is available for the making of improvements be filed by the borrower in the Office of the County Clerk.[4] The purpose of this section of the Lien Law is to make contractors aware of how much of the construction loan will be available to pay them for their labor, as opposed to being used for land acquisition or other expenses. The law provides that a construction lender's security interest be subordinated to any subsequently filed mechanics' liens unless a Section 22 affidavit is filed. The

3. Section 13.3 the New York Lien Law provides, in pertinent part, as follows:

Every such building loan mortgage and every mortgage recorded subsequent to the commencement of the improvement and before the expiration of the period specified in section ten of this chapter for filing of notice of lien after the completion of the improvement shall contain a covenant by the mortgagor that he will receive the advances secured thereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement, and that he will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose....

New York Lien Law § 13.3 (McKinney's 1999)

4. Section 22 of the New York Lien Law provides, in pertinent part, as follows:

A building loan contract either with or without the sale of land, and any modification thereof, must be in writing and duly acknowledged, and must contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred, or to be incurred in connection therewith, and the net sum available to the borrower for the improvement, and, on or before the date of recording the building loan mortgage made pursuant thereto, to be filed in the office of the clerk of the county in which any part of the land is situated, ... No such building loan contract or any modification thereof shall be filed in the register's office of any county. If not so filed the interest of each party to such contract in the real property affected thereby, is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter. New York Lien Law § 22 (McKinney's 1999)

Legislature decreed the same draconian penalty whenever a lender makes the required filings but knowingly filed a materially false statement in connection therewith.

The Section 22 affidavit filed in connection with the Section III construction loan is appended to the Building Loan Contract as Exhibit I and is made part of the contract by incorporation. In pertinent part, it states that "the net sum available to the borrower for the improvement is $5,809,000.00." [5]

*The Initial Advance and Further Advances*

At the closing of the loan, NEBF made an initial advance to NHP–III of $6,639,234.59 for the project. The money was advanced for specific purposes as listed in NHP–III's Request for Advance (R. 237, 243). One item listed in the Request was $4,616,191.00 to reimburse ERA–II for the Common Site Work that had been done on the Section III property prior to its acquisition.

In December 1995, NEBF increased its loan commitment to NHP–III by an additional $1,920,000.00, thereby increasing the total sum available to be loaned to $14 million. In connection therewith, an additional Section 22 affidavit was filed in the Westchester County Clerk's Office, stating, *inter alia*, that an additional $1,393,000.00 was available to the borrower for the improvement. Thus, the two affidavits together stated that, the aggregate sum "available to the borrower for the improvement" was $7,202,000.00.

As of March 20, 1996, NEBF had disbursed in excess of $10.7 million on account of hard costs and $3.25 million on account of soft costs to NHP–III.

*Ritz–Craft's Prior Dealings with Debtors*

Prior to entering into its contract for the development of Section III, Ritz–Craft had payment problems for its work on Section II, which were resolved only after extensive negotiations and the entry of a supplemental agreement between it and both ERA–II and NHP–III. Despite its unsatisfactory relationship with the Nob Hill developers (which Respondent believed were the same people for all three tranches, namely, Dennis Bruschi, Henry Reiter and Ron Ketay), no one at Ritz–Craft took any steps to learn how much of the Section III loan was available to the borrower for the improvement. Ritz–Craft did not examine the Section 22 affidavits until after the project went into bankruptcy in 1998.

*The Proceedings Below*

Seeking priority over NEBF, Ritz–Craft commenced this adversary proceeding. The alleged defect on which it initially relied was the misidentification of the borrower and a line description of a $5 million expenditure under the Building Loan contract in the Section 22 affidavit. In a separate claim, Ritz–Craft asserted that NEBF's claim should be subordinated to its own under principles of equitable subordination.

On December 17, 1998, NEBF moved for summary judgment, pursuant to Bankruptcy Rule 7056, dismissing both claims. In the alternative, NEBF moved, pursuant to Bankruptcy Rule 7012(b)(6), to dismiss the Second Claim for failure to state a claim on which relief can be granted. Insofar as its motion for summary judgment addressed the first claim, NEBF argued that the above-cited Section 22 affidavit did not contain any materially false statement and otherwise complied with the requirements of Lien Law § 22.

On or about January 8, 1999, Ritz–Craft cross-moved for summary judgment on its complaint, contending that the alleged defects in the Section 22 affidavit rendered NEBF's mortgage subordinate to its subsequently-filed mechanics' lien.

On March 24, 1999, Judge Hardin heard oral argument. He ruled from the bench

---

**5.** The Section 22 affidavit misidentifies the Borrower as Elm Ridge Associates II. Judge Hardin correctly ruled that this was not a material defect in the Affidavit.

that the misidentification of the borrower in the Section 22 affidavit was not a material defect in the affidavit; neither was the designation of $5 million to be used for various expenses. He announced that there was only one issue for decision: whether the statement at paragraph 3 of the original Section 22 affidavit, which stated that the net sum of $5,809,000.00 was available to the borrower for the improvement, was erroneous. Additional oral argument was held on April 12, 1999, and a telephone conference call on May 17, 1999 added to the record.

*The Decision Below*

On May 27, Judge Hardin rendered his decision. He stated that the sole issue for determination was "whether the Section 22 Lien Law affidavit correctly stated the 'net sum available to the borrower for the improvement,' and if not, the legal consequence of such failure." Judge Hardin observed that this issue "depends solely on the question of whether the ERA II reimbursement of $4,616,191 can be deemed part of the net sum available to the borrower 'for the improvement.'" (R. 757) (emphasis added).

Notwithstanding his explicit finding that the money had been spent for Common Site Work performed on the Section III site (R. 765), Judge Hardin concluded that the money expended on the ERA–II reimbursement was not "available to the borrower *for the improvement.*" Ruling that the money spent on the common site work did not fit the statutory definition (set forth in Section 2.5 of the Lien Law) of the term "cost of improvement," the Bankruptcy Court concluded that NHP–III's payment to ERA–II, although denominated a "reimbursement," was actually part of the "purchase price NHP III paid for the land." After noting that subtracting out the ERA–II reimbursement would reduce the aggregate amount available for the improvement to approximately $6.2 million—over $1 million less than the $7.2 million claimed in the two Section 22 affi-

davits, he ruled that the Section 22 affidavits contained a material defect.

Judge Hardin then concluded that NEBF had knowingly filed a materially false statement when it filed the non-complying Section 22 affidavit. According to the Bankruptcy Court, NEBF knew when it filed the statement of both the agreement to make the ERA–II reimbursement and that approximately $4.6 million of its Section III loan was used to make that reimbursement. This was sufficient, in Judge Hardin's opinion, to put NEBF on notice of what he had already determined to be the "material defect" in the initial Section 22 Affidavit.

Finally, The Bankruptcy Court determined that Section 22 was a strict liability statute. He held that Ritz–Craft's non-reliance was irrelevant to the issue of whether its mechanics' lien would be deemed superior to NEBF's previously-filed mortgage. He therefore subordinated NEBF's mortgage to Ritz–Craft's lien. After a supplemental telephone conference, Judge Hardin fixed the value of the mechanics lien at $384,251.52, plus costs and interest at the rate of nine percent from April 30, 1996.

NEBF appeals.

### CONCLUSIONS OF LAW

■ Pursuant to Lien Law § 22, "a building loan contract, either with or without the sale of land … must be in writing and duly acknowledged, and must contain a true statement under oath, verified by the borrower, showing the consideration paid, or to be paid, for the loan described therein, and showing all other expenses, if any, incurred or to be incurred in connection therewith, and the net sum available to the borrower for the improvement…." New York Lien Law § 22 (McKinney's 1999). NEBF's primary argument of error is that the Section 22 affidavit in this case did not contain a material defect, because the amounts stated to be available to the borrower for the improvement real-

ly were available for the improvement. NEBF is correct.

The Bankruptcy Court's decision clearly and explicitly rested on its conclusion that the Section II reimbursement for Common Site Work was part of the consideration paid by NHP–III to acquire the Section III site. That Plaintiff–Respondent does not even mention this theory in its brief suggests that even the prevailing party had difficulty with the Bankruptcy Court's approach. This Court has difficulty as well. The Section II reimbursement was not paid to the sellers of the Section III site, and there is no indication in the record that the price paid to the sellers for the site was in any way adjusted to take the fact of the Common Site Work into account, even though that work was performed prior to NHP–III's taking title to the land. The record is undisputed that the moneys transferred to ERA–II by NHP–III covered the cost of the Common Site Work. The grading of the site and the building of such amenities as roads, sewer connections, stormwater management or utilities fall within Lien Law § 2.4, which defines the term "improvement" to include "the demolition, erection, alteration or repair of any structure upon, connected with, or beneath the surface of, any real property and any work done upon such property or materials furnished for its permanent improvement." (McKinney's 1999). Thus, there was no basis for the Bankruptcy Court to conclude that the Section II reimbursement was part of the price paid to acquire the land.

█ The Bankruptcy Court apparently reached its conclusion because the site was "complete with grading, roads, sewer and storm drainage, and utilities already in place," when NHP–III took title to the land. However, under New York law, a party who does not yet have title, but who is a vendee in possession under a contract for purchase of real property, may cause contractors to carry out work on the "improvement" prior to taking title. Numerous New York cases involve circumstances

in which vendees in possession carried out improvements on real property prior to acquiring fee title. *Bedford Lake Park Corp. v. Twelve Linden Corporation,* 8 A.D.2d 818, 190 N.Y.S.2d 143 (2d Dept. 1959); *M & B Plumbing & Heating Company, Inc. v. Cammarata,* 13 A.D.2d 879 (3d Dept.1984). Indeed, the practice is so common in New York that Lien Law § 71–a explicitly states that such advances are to be treated as trust funds under the Lien Law. Thus, the fact that the Common Site Work was done prior to the passage of title to the site does not transform money spent on improvements into money spent to buy the land.

█ Recognizing the flaw in the Bankruptcy Court's reasoning, Ritz–Craft now acknowledges that the Common Site Work was an "improvement" within the meaning of Section 2.4. However, Respondent turns the Court's attention to another section of the Lien Law mentioned by Judge Hardin, Section 2.5, which defines "costs of improvement," in relevant part, as "expenditures incurred by the owner in paying the claims of a contractor, an architect, engineer or surveyor, a subcontractor, laborer and materialman, arising out of the improvement. . . ." Section 2.5 further provides that:

> The application of the proceeds of any building loan mortgage or other mortgage to reimburse the owner for any payments made for any of the above mentioned items for said improvement prior to the date of the initial advance received under the building loan mortgage or other mortgage *shall be deemed to be an expenditure within the "cost of improvement" as above defined; provided, however, such payments are itemized in the building loan contract* and/or other mortgage payments other than a building loan mortgage, *and* provided further, that the payments have been made subsequent to the commencement of the improvements. New York Lien Law § 2.5 (McKinney's 1999) (emphasis added).

Ritz–Craft argues that NEBF was required to itemize the Section II reimbursement in the building loan contract pursuant to Lien Law § 2.5 in order for that money to be part of the "cost of improvement;" that it failed to do so; and that, therefore, the Section II reimbursement cannot be "deemed to be an expenditure within the meaning of the term 'cost of improvement.'" From that, Ritz–Craft reasons, the reimbursement was not part of the "net sum available for the improvement" within the meaning of § 22.[6] NEBF argues strenuously that Section 2.5, read literally, does not apply to the ERA–II disbursement, because the pre-closing expenditures covered by Section 2.5 (i.e., to the contractors who performed the Common Site Work) were advanced by ERA–II, a non-owner of the property. Judge Hardin agreed with NEBF's reasoning.

Ritz–Craft's argument raises an intriguing issue that neither NEBF nor Judge Hardin addressed: whether ERA–II's pre-closing expenditures, which it made as the agent of a contract vendee in possession (who is an "owner" of the land under the Lien Law § 2.3 [7]), fall within Section 2.5. If they do, then the building contract is deficient under that section, since it concededly does not itemize these payments. This would mean the ERA–II reimbursement would not be part of the "cost of improvement" as defined in Section 2.5 of the Lien Law. However, I can leave this fascinating question for another day, as it is irrelevant to the issue before me. The fundamental flaw in Ritz–Craft's argument in that Section 2.5 of the Lien Law has nothing whatever to do with Section 22.

Section 22 imposes a draconian penalty on lenders who fail to comply with its

terms: It subordinates their secured loans and divests them of the priority for which they bargained when they advanced substantial funds to borrowers. While the New York Court of Appeals has noted that the Lien Law must be liberally construed, *see Nanuet National Bank v. Eckerson Terrace,* 47 N.Y.2d 243, 249, 417 N.Y.S.2d 901, 391 N.E.2d 983 (1979), it neither encourages nor requires a court to rewrite the statute where it is clear on its face. Therefore, the statute must be construed in accordance with its terms. It requires that an affidavit be filed, and that the affidavit must set forth "the net sum available to the borrower *for the improvement.*" It does not require that the affidavit set forth "the net sum available to the borrower *for the cost of the improvement.*"

The fair import of both Ritz–Craft's argument and Judge Hardin's opinion is that the terms "improvement" and "cost of improvement" are interchangeable. They are not. The two terms are separately defined: "improvement" in Section 2.4 and "cost of improvement" in Section 2.5. And Section 22 quite explicitly uses the term "improvement," not "cost of improvement." So whether the building loan contract complies with Section 2.5 is irrelevant to the relative priority of Ritz–Craft's and NEBF's loans.

This conclusion, drawn from the literal language of Section 22, is further compelled by referring back to Section 13.3 of the Lien Law—the section that requires the mortgagor to covenant in the mortgage that it will hold the funds disbursed to it in trust for use on the project. That section goes on to provide: "[N]othing in this section, nor in that portion of section two of this chapter, defining 'cost of improvement' shall be deemed to impair or subor-

---

**6.** It appears that this is the logical path that Judge Hardin took, albeit *sub silencio,* in order to reach the conclusion that the Section II reimbursement was part of the "Cost of Acquisition"—a term that appears nowhere in the Lien Law, but that is suggested by the expenditure's falling outside the definition of the term "Cost of Improvement."

**7.** "The term 'owner,' when used in this chapter, includes the owner in fee of real property, ... a vendee in possession under contract for the purchase of such real estate...." New York Lien Law § 2.3 (McKinney's 1999).

dinate the lien of any mortgage containing the covenant required by this subdivision." New York Lien Law § 13.3 (McKinney's 1999). Thus, as long as a mortgage contains a § 13.3 trust covenant, nothing in Section 2.5 can be relied upon to subordinate a mortgage lien. In this case, the mortgage contains a Section 13.3 covenant. Therefore, the very portion of Section 2.5 on which Ritz–Craft relies—the definition of "cost of improvement"—falls out of the Section 22 equation.

■ Having disposed of this issue, I turn to Ritz–Craft's other arguments. First, Ritz–Craft contends that, at the time the Section 22 affidavit was filed, the $4.6 million Section II reimbursement was not *available* to the borrower for the improvement" because it had *already been spent* on the improvement. Since the Legislature's purpose was to advise contractors of the amount of money that would be available on which they could rely for payment for their labors, See *Nanuet National Bank v. Eckerson Terrace*, 47 N.Y.2d 243, 417 N.Y.S.2d 901, 391 N.E.2d 983 (1979), Ritz–Craft argues that the affidavit materially overstated the amount of money it and other contractors could look to for payment as of the time the affidavit was filed.

The New York Court of Appeals has yet to opine whether Ritz–Craft's reading of Section 22 of the Lien Law is right or wrong. However, at least two lower courts, one State and one Federal, have ruled that the phrase "net sum available to the borrower for the improvement" encompasses sums expended by the borrower for making improvements prior to the affidavit's filing. For example, in *Adirondack Trust Company v. Thomas J. Bien & Associates, Inc.*, 168 Misc.2d 919, 645 N.Y.S.2d 288 (1996), a mortgage foreclosure action, a mechanics' lienor contended that the mortgage should be subordinated to its lien because the sum stated in the Section 22 affidavit as available for construction included $75,000 that had been advanced to the developer of a one-family house prior

to the closing of the loan. The court held that the lender did not knowingly file a materially false statement in the affidavit, because the entire sum stated—including the $75,000 advance—was "available ... for the construction of a one-family residence." That case, involving as it did an advance of construction monies, is on all fours with this one.

Similarly, in *United States v. Eljos Associates*, No. 84 Civ.1952, 1986 U.S. Dist. LEXIS 20351, 1986 WL 10467 (S.D.N.Y. Sept. 16, 1986), Judge Keenan of this Court rejected a mechanics' lienor's argument that a Section 22 affidavit was false at the time it was filed because the borrower had paid some $387,000 in "hard costs" between the date the affidavit was executed and the date of filing. He held that the affidavit "satisfied Section 22 as a matter of law," 1986 U.S. Dist. LEXIS 20351 at *15, because the $387,000 was requisitioned to reimburse the contractor for improvements and was disbursed with that intention. That case, too, is foursquare factually with this one, in that NHP–III's Section 22 affidavit was executed on February 14, 1995—9 days prior to the closing of the construction loan and the disbursement of any funds to ERA–II or anyone else—and the funds that Ritz–Craft claims should have been subtracted from the "net amount available to the borrower for the improvement" were expended between the date of execution and the date of filing.

These cases are all the more persuasive in view of the fact that Lien Law Section 22 does not require the borrower to file a revised affidavit every time it disburses funds for improvements. It stands to reason that less money is available to pay a contractor who performs work later in the construction process because contractors who worked on the site earlier will already have been paid. In most cases, some portion—perhaps a significant portion—of a construction loan will have been drawn down to pay the builder, the plumber, the roofer and the electrician before the paint-

er begins his work. Nonetheless, there is no requirement in the Lien Law that the borrower update its Section 22 affidavit every time it draws down funds under a construction loan. The Legislature could have drafted the statute to so provide; it did not do so. The literal language of the Lien Law does not require disclosure of the amount available to any particular contractor for any particular improvement, but rather the amount available to the borrower for the entire improvement. The affidavit filed by NHP–III in this case satisfies the Legislature's demand.

Ritz–Craft further argues that a February 23, 1995 internal memorandum produced in this adversary proceeding "strongly suggests" the material falsity of the affidavit. I have reviewed the February 23 memorandum, and I cannot agree with Ritz–Craft's contention. The February 23 memorandum appears to be a document prepared in connection with the closing of the loan; indeed, it was written on the day of the closing. The memorandum discloses that a portion of the proceeds to be made available to the borrower for "construction costs" would be expended as part of the "reimbursement to Phase II." But that undisputed fact suggests nothing about the material falsity of the affidavit.[8] The only issue before Judge Hardin, and the only issue before me, is the legal effect of that undisputed fact. The February 23 memorandum sheds no light whatever on that subject.

In light of my conclusion that the Section 22 affidavit does not contain a materially false statement, it is not possible that NEBF knowingly filed a materially false statement. Therefore, the Bankruptcy Court had no statutory basis to subordinate NEBF's mortgage to Ritz–Craft's subsequently-filed mechanics' lien, and its order granting Plaintiff–Respondent's motion for summary judgment on the First

Claim in the adversary proceeding must be reversed. Indeed, because there are no disputed issues of material fact, and NEBF is entitled to judgment as a matter of law, Defendant–Respondent's motion for summary judgment dismissing the First Claim must be granted.

The Bankruptcy Court did not need to determine, and did not determine, NEBF's motion for summary judgment dismissing Ritz–Craft's Second Claim, in which Plaintiff–Appellant sought subordination on the ground of equitable estoppel. NEBF's motion must be granted. The statutory remedy of Lien Law Section 22 provides the only basis for subordination of the later-filed mechanics' lien to the earlier perfected construction loan. As Ritz–Craft has failed to establish a basis for subordinating the lien under the statute, it cannot state a viable claim for subordination on any basis.

The judgment of the Bankruptcy Court is reversed and matter is remanded with instructions to enter judgment in the adversary proceeding in favor of Defendant–Appellant dismissing the complaint, together with costs to Defendant–Appellant.

---

8. Ritz–Craft has offered no evidence whatever that would support any conclusion that the Section II reimbursement was not used to reimburse ERA–II for Common Site Work done on the Section III premises, so there is no basis for me to disturb Judge Hardin's finding that the funds were in fact so used.